UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT

_____

No. 22-2927
_____

PARENTS DEFENDING EDUCATION,
Plaintiff–Appellant,

vs.

LINN-MAR COMMUNITY SCHOOL DISTRICT, et al.,
Defendants–Appellees.

_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA,
CEDAR RAPIDS DIVISION
THE HONORABLE CJ WILLIAMS

_____

**DEFENDANTS–APPELLEES' BRIEF**
_____

Miriam D. Van Heukelem (AT0010074)
Emily A. Kolbe (AT0012313)
AHLERS & COONEY, P.C.
100 Court Avenue, Suite 600
Des Moines, Iowa 50309-2231
(515) 243-7611
(515) 243-2149
mvanheukelem@ahlerslaw.com
ekolbe@ahlerslaw.com
ATTORNEYS FOR DEFENDANTS-APPELLEES

1

# **TABLE OF CONTENTS**

**Pages**

TABLE OF CONTENTS..................................................................... 2

TABLE OF AUTHORITIES ............................................................ 4

STATEMENT OF THE ISSUES...................................................... 7

STATEMENT OF THE CASE.......................................................... 9

SUMMARY OF THE ARGUMENT ............................................... 13

ARGUMENT ................................................................................... 15

I.    The District Court's Denial of PDE's Motion for Preliminary Injunction Was Not an Abuse of Discretion ..................................... 15

II.    The District Court Correctly Held That PDE Was Unlikely to Succeed on the Merits of Its Claims Because PDE Does Not Have Standing ...................................................................................... 17

    A.    Parents A-C Did Not Provide Sufficient Facts to Support a Finding They Suffered an Injury ...................................... 19

    B.    Parents D-G Did Not Provide Sufficient Facts to Support a Finding They Have Suffered an Injury...................................... 24

    C.    PDE Cannot Show Causation or Redressability .......................... 28

III.    The Policy Does Not Violate Students' Speech Rights Protected Under the First and Fourteenth Amendments ................................... 34

    A.    The Policy Does Not Compel Speech ......................................... 34

    B.    The Policy Does Not Constitute Content or Viewpoint Discrimination ..................................................................... 38

    C.    The Policy is Not Overbroad or Vague...................................... 44

    D.    The Policy Does Not Violate Parents' Rights Under the Fourteenth Amendment.......................................................... 47

    E.    The District Court Did Not Err in Finding that the Remaining *Dataphase* Factors Weigh Against Granting Injunctive Relief ... 55

        1.  PDE has failed to show irreparable harm will occur from denial of a preliminary injunction ......................................... 55

        2.  The district court correctly found that the balance or harms disfavors injunctive relief....................................... 56

2

    3. The district court correctly found that the public interest weighs against injunctive relief...............................................57

CONCLUSION.................................................................................58

CERTIICATE OF SERVICE ...........................................................59

CERTIFICATE OF COMPLIACE....................................................60

Appellate Case: 22-2927    Page: 3    Date Filed: 12/08/2022 Entry ID: 5225286

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Ams. for Prosperity Found. v. Bonta*, 141 S. C.t 2373 (2021) ............................... 45

*Arnold v. Bd. Of Educ. Of Escambia County, Alabama*,
880 F.2d 305 (11th Cir. 1989).......................................................... 8, 54

*Attias v. Carefirst, Inc.*, 865 F.3d 620 (D.C. Cir. 2017) ......................................... 18

*Balogh v. Lombardi*, 816 F.3d 536 (8th Cir. 2016) ................................................ 27

*Beidenkopf v. Des Moines Life Ins. Co.*, 141 N.W. 434 (Iowa 1913) .................... 15

*Benisek v. Lamone*, 38 S. Ct. 1942 (2018)............................................................. 55

*Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 685 (1986) ..................... Passim

*Carpenters Indus. Council v. Zinke*, 854 F.3d 1 (D.C. Cir. 2017) ........................ 29

*Clapper v. Amnesty Int'l, USA*, 568 U.S. 398 (2013).................................... Passim

*D.M. by Bao Xiong v. Minnesota State High Sch. League*, 917 F.3d 994
(8th Cir. 2019)................................................................... 7, 8, 16, 56

*Dakota Indus. Inc. v. Dakota Sportswear, Inc.*, 988 F.2d 61 (8th Cir. 1993) ........ 16

*Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109 (8th Cir. 1981) ........... 7, 14, 15

*Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629 (1999) ................................ 37

*Epperson v. Arkansas*, 393 U.S. 97 (1968)...................................................... 35, 40

*Fed. Election Commn. v. Cruz*, 212 L. Ed. 2d 654 (May 16, 2022)...................... 21

*Frank N. Magid Assocs, Inc. v. Marrs*, 2017 WL 3091457
(N.D. Iowa Jan. 9, 2017)..................................................................... 57

*Ft. Des Moines Church of Christ v. Jackson*, 215 F. Supp. 3d 776
(S.D. Iowa 2016) ................................................................................. 25

*Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 267 (1988) .................. 7, 35, 40

*Herndon v. Chapel Hill-Carrboro Bd. of Educ.*, 89 F.3d 174
(4th Cir. 1996) .................................................................................... 49

*Hunt v. Wash. State Apple Advert. Comm'n,*, 432 U.S. 333 (1977) ...................... 21

*In re SuperValu, Inc.*, 870 F.3d 763 (8th Cir. 2017)............................................. 18

*Janus v. Am. Fed'n of State, County, and Mun. Employees, Council 31*,
138 S. Ct. 2448 (U.S. 2018)................................................................. 38

*Jet Midwest Int'l Co. v. Jet Midwest Grp.*, 953 F.3d 1041 (8th Cir. 2020)............ 16

*Jibril v. Mayorkas*, 20 F.4th 804 (D.C. Cir. 2021) ............................................... 20

*John and Jane Parents 1 v. Montgomery County Board of Education*,
2022 WL 3544256............................................................... 8, 48, 49

*Jones v. Kelley*, 854 F.3d 1009 (8th Cir. 2017) .................................................... 16

*Leatherman v. Tarrant County Narcotics Intel. And Coordination Unit*,
507 U.S. 163 (1993) ............................................................................ 54

Appellate Case: 22-2927   Page: 4   Date Filed: 12/08/2022 Entry ID: 5225286

*Let Them Play MN v. Walz*, 517 F. Supp. 3d 870 (D. Minn. 2021) .................. 8, 55

*Louis Effort for AIDS v. Huff*, 782 F.3D 1016 (8th Cir. 2015)........................ 15, 54

*Mahanoy Area School District v. B.L.,* 141 S. Ct. 2038 (2021) ............. 7, 40, 41, 46

*Meriwether v. Hartop*, 992 F.3d 492 (6th Cir. 2021) ...................................... 36, 38

*Meyer v. Nebraska,* 262, 390, 402 (1923) ................................................. 35, 40, 48

*Missourians for Fiscal Accountability v. Klahr*, 830 F.3d 789 (8th Cir. 2016) ..... 25

*Morse v. Frederick*, 551 U.S. 393 (2007) .......................................................... 37

*MPAY Inc. v. Erie Custom Computer Applications, Inc.*, 970 F.3d 1010
  (8th Cir. 2020)................................................................................ 7, 15, 16

*New Jersey v. T.L.O.*, 469 U.S. 325 (1985) ......................................................... 40

*New York v. Ferber,* 458 U.S. 747 (1982) .......................................................... 50

*Norwood v. Harrison*, 413 U.S. 455 (1973) ........................................................ 48

*Portz v. St. Cloud State Univ.*, 196 F. Supp. 3d 963 (D. Minn. 2016) ............... 8, 57

*Reno v. Flores*, 507 U.S. 292 (1993) ................................................................. 47

*Republican Party of Minn. v. Klobuchar*, 381 F.3d 785 (8th Cir. 2004)............... 25

*Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs*,
  826 F.3d 1030 (8th Cir. 2016)................................................................. 16

*Runyon v. McCrary*, 427 U.S. 160 (1976) ........................................................ 8, 48

*S.J.W. ex rel. Wilson v. Lee's Summit R-7 Sch. Dist.*,
  696 F.3d 771 (8th Cir. 2012)................................................................. 15, 56

*Saxe v. State College Area School District*, 240 F.3d 200 (3d Cir. 2001)........ 41, 42

*Sch. of the Ozarks, Inc. v. Biden*, 41 F.4th 992 (8th Cir. 2022)......................Passim

*Spokeo Inc. v. Robins*, 136. S. Ct. 1540, 1547 (2016)), 136 S. Ct. at 1548) .......... 18

*St. Paul Area Chamber of Com. v. Gaertner*, 439 F.3d 481 (8th Cir. 2006).......... 17

*Stevenson v. Blytheville Sch. Dist. #5*, 800 F.3d 955 (8th Cir. 2015)........... 8, 47, 48

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014)..................... 7, 17, 19, 25

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.,* 393 U.S 503 (1969). .............Passim

*Troxel v. Granville,* 530 U.S. 57 (2000) ................................................................ 48

*Turkish Coalition of Am., Inc. v. Bruininks*, 678 F.3d 617 (8th Cir. 2012).....Passim

*United Indus. Corp. v. Clorox Co.*,140 F.3d 1175 (8th Cir. 1998)........................ 16

*Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646 (1995) ........................................ 35

*Vroegh v. Iowa Dept. of Corrections*, 972 N.W.2d 686 (Iowa 2022) ................... 31

*Washington v. Glucksberg*, 521 U.S. 702, 703 (1997) .......................................... 47

*Watkins, Inc. v. Lewis*, 346 F.3d 841 (8th Cir. 2003) ........................................... 55

*West Virginia Board of Education v. Barnette,* 319 U.S. 624 (1943) ................... 34

*Whitmore v. Arkansas*, 495 U.S. 149 (1990) ....................................................... 18

*Wisc. v. Yoder*, 406 U.S. 205 (1972)................................................................... 48

Appellate Case: 22-2927   Page: 5   Date Filed: 12/08/2022 Entry ID: 5225286

## Statutes

20 U.S.C. §1232g ................................................................. 51
20 U.S.C. § 1232g(a)(1)(A) ............................................... 53
20 U.S.C. § 1232g(b)(1) ..................................................... 52
20 U.S.C. §§ 1681 ......................................................... 42, 43
Iowa Code Section 216.9 ............................................. Passim
Iowa Code § 280.28 ............................................... 30, 42, 43

## Rules

Fed. R. App. P. 32(a)(5) ..................................................... 60
Fed. R. App. P. 32(a)(6) ..................................................... 60
Fed. R. App. P. 32(a)(7)(B) ............................................... 60
Fed. R. App. P. 32(a)(7)(B)(iii) ......................................... 60
Federal Rule of Civil Procedure 65(a) ............................... 15

## Regulations

*Enforcement of Title IX of the Education Amendments of 1872 with Respect to Discrimination Based on Sexual Orientation and Gender Identity in Light of Bostock v. Clayton County*,
86 Fed. Reg. 32637 (June 22, 2021) ........................... Passim

# STATEMENT OF THE ISSUES

I.  Did the district court abuse its discretion in denying PDE's motion for preliminary injunction?

Authority

*Dataphase Sys., Inc. v. C L Sys., Inc.,* 640 F.2d 109 (8th Cir. 1981).
*MPAY Inc. v. Erie Custom Computer Applications, Inc.*, 970 F.3d 1010 (8th Cir. 2020).
*D.M. by Bao Xiong v. Minnesota State High Sch. League*, 917 F.3d 994 (8th Cir. 2019).

II. Did the district court correctly deny PDE's motion for preliminary injunction on the basis that PDE failed to show a likelihood of success on the merits because PDE failed to present sufficient facts to demonstrate standing?

Authority

*Sch. of the Ozarks, Inc. v. Biden*, 41 F.4th 992, 997 (8th Cir. 2022).
*Clapper v. Amnesty Int'l, USA*, 568 U.S. 398 (2013).
*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014).
*Turkish Coal. of Am., Inc. v. Bruininks*, 678 F.3d 617 (8th Cir. 2012).

III. Did the district court correctly deny PDE's motion for preliminary injunction on the basis that PDE failed to show a likelihood of success on the merits because PDE is unlikely to succeed on the substance of its First Amendment claims?

Authority

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969).
*Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675 (1986).
*Hazelwood Sch. Dist. v Kuhlmeier*, 484 U.S. 260 (1988).
*Mahanoy Area Sch. Dist. v. B.L.*, 141 S. Ct. 2038 (2021).

IV. Did the district court correctly deny PDE's motion for preliminary injunction on the basis that PDE failed to show a likelihood of success on

7

the merits because PDE is unlikely to succeed on the substance of its Fourteenth Amendment claims?

<u>Authority</u>

*Runyon v. McCrary*, 427 U.S. 160 (1976).
*Stevenson v. Blytheville Sch. Dist. #5*, 800 F.3d 955 (8th Cir. 2015).
*Arnold v. Board of Education of Escambia County, Alabama*, 880 F.2d 305, 312 (11th Cir. 1989).
*John and Jane Parents 1 v. Montgomery County Board of Education*, Case No. 8:20-3552-PWG, 2022 WL 3544256, *slip op.* (D. Md. Aug. 18, 2022).

V.    Did the district court correctly deny PDE's motion for preliminary injunction on the basis that PDE failed to satisfy the remaining preliminary injunction factors?

<u>Authorities</u>

*Turkish Coal. of Am., Inc. v. Bruininks*, 678 F.3d 617 (8th Cir. 2012).
*D.M. by Bao Xiong v. Minnesota State High Sch. League*, 917 F.3d 994 (8th Cir. 2019).
*Let Them Play MN v. Walz*, 517 F. Supp. 3d 870, 887 (D. Minn. 2021).
*Portz v. St. Cloud State Univ.*, 196 F. Supp. 3d 963, 978 (D. Minn. 2016).

# STATEMENT OF THE CASE

The Linn-Mar Community School District ("School District") is a public school district located in Marion, Iowa. Pursuant to Iowa state law and federal law, the School District is required to protect students from discrimination and harassment on the basis of gender. *See* Iowa Code Section 216.9 (prohibiting discrimination and harassment in education on the basis of gender); *see also* U.S. Dept' of Educ., *Notice of Interpretation: Enforcement of Title IX of the Education Amendments of 1872 with Respect to Discrimination Based on Sexual Orientation and Gender Identity in Light of Bostock v. Clayton County*, 86 Fed. Reg. 32637 (June 22, 2021). During the past several years, upon request, the School District has provided students with various supports and accommodations relating to gender identity. App. 482; R. Doc. 15-5 at 1. The School District's administration developed board policies to document the types of supportive measures that may be made available to students upon request. App. 483; R. Doc. 15-5 at 2. During a school board meeting in April 2022, the School District's Board of Directors reviewed and discussed Board Policy 504.13, "Transgender and Students Nonconforming to Gender Role Stereotypes," and 504.13-R, "Administrative Regulations Regarding Transgender and Students Nonconforming to Gender Role Stereotypes." App. 476, 482-83; R. Doc. 15-3 at 1, R. Doc. 15-5 at 1-2. The School Board also heard comments from more than seventy people in support of and in opposition to the

9

policies. App. 483; R. Doc. 15-5 at 2. Ultimately, the School Board voted to adopt both Policies 504.13 and 504.13-R.

The administrative regulations in Board Policy no. 504.13-R ("Policy") implement and clarify the School District's obligations under Board Policy no. 504.13, which PDE has not challenged in this action. *See generally* App. 9-37; R. Doc. 1 at 1-29. Board Policy no. 504.13 notes that:

> The Iowa Civil Rights Act (Iowa Code Section 216.9) and Title IX protect transgender students from sex and/or gender discrimination and clearly delineate that protection from unfair practices and discriminatory acts in education, including gender identity.
>
> These administrative regulations set forth the district's protocols that will be utilized to expeditiously address the needs of transgender students, gender-expansive students, nonbinary, gender nonconforming students, and students questioning their gender to ensure a safe, affirming, and healthy school environment where every student can learn effectively.

App. 476; R. Doc 15-3 at 1. The administrative regulations set forth in the Policy cover the following categories of information related to students' and gender identity information: (1) Establishment of Gender Supports, (2) Confidentiality, (3) Names and Pronouns, (4) Restrooms and Locker Rooms, (5) Dress Code, (6) Physical Education and Athletics, (7) Overnight Trips, (8) Records, (9) Discrimination and Harassment, (10) Media and Community Communications, and (11) Definitions. *See generally* App. 477-481; R. Doc. 15-4 at 1-5. The School District does not initiate any discussion of gender supports for a student; any such discussion is held only upon request by the student and/or their parent or guardian. App. 483; R. Doc. 15-5 at 2. The School

10

District has never issued any student a gender support plan without such a request. *Id.*

Parents Defending Education ("PDE") defines itself as a "nationwide, grassroots membership organization whose members are primarily parents of school-aged children" App. 70; R. Doc. 3-9 at 1. PDE's mission is to oppose "government attempts to usurp parents' rights and to silence students who express opposing views." *Id.* PDE "seeks to stop indoctrination in the classroom and promote the restoration of a healthy, non-political education for kids," through various methods including legal action against public school districts across the country. *Id.*

On August 2, 2022, four months after the School District adopted the Policy, PDE filed a Complaint against the School District in the United States District Court for the Northern District of Iowa. *See* App. 9-37; R. Doc. 1. PDE claims it has seven members who are parents of students currently or formerly enrolled in the District. App. 39-72; R. Doc. 3-2–3-8. The School District does not know the identity of the seven member-parents, who have identified themselves only as Parents A, B, C, D, E, F, and G to date. *See id.* PDE named the School District, along with Superintendent Shannon Bisgard and the School District's seven School Board members in their official capacities as defendants in the lawsuit. *Id.* PDE alleges that the Policy violates its member-parents' constitutional rights under the First and Fourteenth Amendments by (1) depriving parents of information regarding their students' gender; (2) depriving parents of the right to have input or control over fundamental decisions concerning

11

gender identity; (3) compelling student speech; and (4) disciplining students based on the content and viewpoint of their speech. PDE also contends the Policy violates the First Amendment by being unconstitutionally overbroad and vague. *See generally id.* PDE seeks declaratory relief, injunctive relief, and attorney's fees from the district court. App. 28; R. Doc. 1 at 28.

On August 5, 2022, PDE moved the district court for a preliminary injunction, seeking to enjoin the Policy during the pendency of this litigation. *See generally* R. Doc. 3. On September 12, 2022, the district court denied PDE's motion in full, issuing a preliminary ruling on the motion. App. 502-512; R. Doc. 28. On September 20, 2022, the district court entered its full ruling denying PDE's motion for preliminary injunction. App. 515-42; R. Doc. 38. PDE filed an interlocutory appeal challenging the district court's ruling on the motion for preliminary injunction. Proceedings in the district court have been stayed during the pendency of this appeal.

Appellate Case: 22-2927    Page: 12    Date Filed: 12/08/2022 Entry ID: 5225286

## SUMMARY OF THE ARGUMENT

The district court did not abuse its discretion when it denied PDE's motion for preliminary injunction. In its appeal, as in the proceedings below, PDE relies on generalized theories about alleged nationwide "parental exclusion" policies to try to substantiate the speculative fears of seven anonymous parents who are members of PDE and contest the School District's Policy No. 504.13-R. In its ruling, the district court analyzed PDE's motion for preliminary injunction under the applicable legal standard and, based on the factual record presented by the parties, found that PDE failed to meet the threshold necessary for preliminary injunctive relief.

The district court did not abuse its discretion in finding that PDE failed to show it was likely to succeed on the merits of its claims. First, the district court did not err in finding that PDE failed to present sufficient factual evidence to show it had standing and, therefore, PDE was unlikely to succeed on the merits of its claims. On PDE's Fourteenth Amendment claim, PDE failed to present evidence that Parents A–C had sustained any injury-in-fact to a constitutional right and instead focused only on those parents' speculation and conjecture regarding how the Policy might be applied and might impact their children. On PDE's First Amendment claim, PDE failed to present evidence that the Policy had injured the rights of any parent, including that the Policy chilled any student's right to engage in protected speech.

13

PDE also failed to present sufficient evidence of causation or redressability to support standing.

Second, the district court did not abuse its discretion in finding that PDE failed to present sufficient evidence that it was likely to succeed on the merits of its First and Fourteenth Amendment claims. Contrary to PDE's arguments, the Policy does not compel any student speech and it does not discriminate against students based on content or viewpoint in violation of the First Amendment. The Policy is also not facially overbroad or vague and, thus, PDE failed to show that it was likely to succeed on the merits of these claims.

The district court did not abuse its discretion in finding that PDE failed to show a likelihood of success on the remaining *Dataphase* factors. PDE has not demonstrated a likelihood of harm, much less irreparable harm, in the absence of injunctive relief. Additionally, both the balance of harms weighs in favor of denial of the injunction because the harms suffered by the District and all of its students and families if the Policy is enjoined greatly outweigh the speculative harms alleged by PDE. Finally, the public interest weighs in favor denying the injunction because of the compelling interest schools have in protecting students from discrimination and harassment and ensuring a safe and supportive learning environment for all students.

Appellate Case: 22-2927    Page: 14    Date Filed: 12/08/2022 Entry ID: 5225286

## ARGUMENT

### I. The District Court's Denial of PDE's Motion for Preliminary Injunction Was Not an Abuse of Discretion.

Federal Rule of Civil Procedure 65(a) authorizes a district court to issue a preliminary injunction, and the issuance or refusal to do so rests within the discretion of the district court. *Louis Effort for AIDS v. Huff,* 782 F.3d 1016, 1021 (8th Cir. 2015). "Whether a preliminary injunction should issue involves consideration of (1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest." *S.J.W. ex rel. Wilson v. Lee's Summit R-7 Sch. Dist.*, 696 F.3d 771, 776 (8th Cir. 2012) (quoting *Dataphase Sys., Inc. v. C L Sys., Inc.,* 640 F.2d 109, 113 (8th Cir. 1981)). Only where the party moving for an injunction shows that each of these factors "weigh in its favor" is injunctive relief appropriate. A preliminary injunction is an "extraordinary remedy" that should not be granted unless clearly required to avoid irreparable damage. *MPAY Inc. v. Erie Custom Comput. Applications, Inc.*, 970 F.3d 1010, 1015 (8th Cir. 2020); *see also Beidenkopf v. Des Moines Life Ins. Co.*, 141 N.W. 434, 437-38 (Iowa 1913) ("A preliminary injunction should issue only when there exists 'a pressing necessity to avoid injurious consequences, which cannot be repaired under any standard of compensation.'").

Each factor must be considered in determining "whether the balance of

15

equities weighs toward granting the injunction." *United Indus. Corp. v. Clorox Co.*, 140 F.3d 1175, 1179 (8th Cir. 1998); *See also Dakota Indus. Inc. v. Dakota Sportswear, Inc.*, 988 F.2d 61, 64 (8th Cir. 1993). "While no single factor is determinative, the probability of success factor is the most significant. *MPAY Inc.*, 970 F.3d at 1015 (quotations omitted). "An injunction cannot issue if there is no chance of success on the merits." *Jet Midwest Int'l Co. v. Jet Midwest Grp.*, 953 F.3d 1041, 1044 (8th Cir. 2020).

A district court's denial of a preliminary injunction is reviewed for abuse of discretion. *D.M. by Bao Xiong v. Minnesota State High Sch. League*, 917 F.3d 994, 999 (8th Cir. 2019). Abuse of discretion occurs where the district court "rests its conclusion on clearly erroneous factual findings or erroneous legal conclusions." *Id*. (quoting *Jones v. Kelley*, 854 F.3d 1009, 1013 (8th Cir. 2017) (per curiam)). The Court "will not disturb a district court's discretionary decision if such decision remains within the range of choice available to the district court, accounts for all relevant factors, does not rely on any irrelevant factors, and does not constitute a clear error of judgment." *Id.* (quoting *Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs*, 826 F.3d 1030, 1035 (8th Cir. 2016)). Only the district court's legal conclusions are reviewed de novo. *Id.* For the following reasons, PDE has failed to show the district court abused its discretion by relying on erroneous factual

16

findings or legal conclusions. Accordingly, the judgment of the district court should be affirmed.

## II. The District Court Correctly Held That PDE Was Unlikely to Succeed on the Merits of Its Claims Because PDE Does Not Have Standing.

The district court correctly held that PDE was unlikely to succeed on the merits of its claims. In making this finding, the district court held that PDE had failed to allege facts sufficient to show standing. App. 531–35; R. Doc. 38 at 17–21. Questions of standing are reviewed de novo. *See St. Paul Area Chamber of Com. v. Gaertner*, 439 F.3d 481, 484 (8th Cir. 2006). Because the district court did not err in finding that PDE failed to show it was likely to have standing, and thus unlikely to succeed on the merits, the district court's denial of a preliminary injunction should be affirmed.

PDE contends the district applied the wrong legal test for standing because PDE was required to show either that an "injury is 'certainly impending' *or* there is a 'substantial risk' that the harm will occur," and that the district court only addressed whether PDE showed a "certainly impending" injury. Appellant's Br. at 20 (citing *Susan B. Anthony v. Driehaus*, 573 U.S. 149, 159 (2014)). PDE cites no authority for the proposition that "certainly impending" and "substantial risk" are, in fact, different legal standards in application or provide case law supporting their claim that the district court's reference to "certainly impending" rather than "certainly impending or substantial risk" constitutes legal error. The case cited by

17

PDE in support of its argument that the district court applied the wrong legal standard, *In re SuperValu, Inc.*, expressly noted that while "both the 'certainly impending' and 'substantial risk' standards are applicable in future injury cases," there has been no resolution as to whether those standards "are distinct." *In re SuperValu, Inc.*, 870 F.3d 763, 769 (8th Cir. 2017)). This Court recently affirmed the "certainly impending" injury requirement, explaining that "[a]llegations of possible future injury do not satisfy the requirements of Article III. A threatened injury must be <u>certainly impending</u> to constitute injury in fact." *Sch. of the Ozarks, Inc. v. Biden*, 41 F.4th 992, 997 (8th Cir. 2022) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)) (emphasis added).

Even if this Court finds the district court should have explicitly referenced the term "substantial risk," however, it does not save PDE. The district court's ruling shows that it contemplated the ultimate question of standing—whether PDE had presented any injury beyond speculation or conjecture. *See Attias v. Carefirst, Inc.*, 865 F.3d 620, 626 (D.C. Cir. 2017) ("An injury in fact must be concrete, particularized, and, most importantly for our purposes, 'actual or imminent' rather than speculative." (quoting *Spokeo Inc. v. Robins*, 136. S. Ct. 1540, 1547-1548 (2016)). The district court focused on the fact that there had not been "a sufficient factual recitation for the Court to conclude, at this stage, that Parents A–G or their children have suffered an injury in fact," given that PDE had "only stated boilerplate,

notional, subjective fears of chilled speech" and that PDE's member-parents' fears regarding gender support plans represented only "a conjectural possibility of injury." App. 532-33; R. Doc. 38 at 18-19.

The district court recognized that speculative fears do not satisfy the injury-in-fact standing requirement. That is an accurate statement of the applicable law and Plaintiff's quibbling about terminology does not change the facts in the record. *See e.g.*, *Clapper v. Amnesty Int'l, USA*, 568 U.S. 398, 409 (2013)); *Susan B. Anthony*, 573 U.S. at 158. Because PDE's theory of injury requires "too many speculative assumptions without sufficient factual allegations to support a finding of injury," the district court correctly found PDE likely did not have standing to proceed and injunctive relief was not appropriate. App. 533-34; R. Doc. at 19-20 (citing *Turkish Coal. of Am., Inc. v. Bruininks*, 678 F.3d 617, 622 (8th Cir. 2012). Accordingly, the district court correctly denied PDE's motion for preliminary injunction. *See id.*

## A. Parents A–C Did Not Provide Sufficient Facts to Support a Finding They Suffered an Injury.

The district court correctly ruled that Parents A–C do not have standing because they presented only a "conjectural possibility of injury via a Gender Support Plan being created for their children without parental knowledge or involvement." App. 533; R. Doc 38 at 19. PDE claims Parents A–C have suffered the following two injuries: (1) the Administrative Regulations allegedly prohibit the District from

19

telling parents whether their children have been given a gender support plan or if the school has taken "any other actions to effectuate their child's gender transition" and (2) the parents fear that the Administrative Regulations will interfere with their "fundamental right as a parent to guide their child's upbringing and to help [their] child navigate any issues that might arise regarding [their] perception of their gender identity." Appellant's Br. at 20–21. Neither of these alleged "injuries" support a finding that Parents AC are likely to have standing in this action.

A party may be able to satisfy the injury requirement for a future harm when the risk of harm is "sufficiently imminent and substantial." *Jibril v. Mayorkas*, 20 F.4th 804, 817 (D.C. Cir. 2021). However, a party must provide the court with sufficient facts to support that finding, which PDE failed to do. *See id.* (analyzing the plaintiff's future travel plans and status on a government watchlist and finding that the "feared injury is concrete and particularized, as the harm is real, rather than abstract, and it affects the [plaintiff] 'in a personal and individual way'"). PDE provided declarations from its member-parents in support of their claims. App. 39-69; R. Doc. 3-2–3-8. However, none of the declarations contain facts sufficient to find standing.

Parent A is concerned that their child, who is on the autism spectrum, is at "substantial risk" of receiving a gender support plan or "other gender-specific treatment" without Parent A's knowledge or consent. App. 40-41; R. Doc. 3-2 at 2-3. Parent A believes this because their child has "difficulty distinguishing between male

20

characteristics and female characteristics" and occasionally makes unidentified statements that Parent A believes "could lead an outside observe to believe that [their] child is confused about their gender identity or expressing a "gender-fluid" or "non-binary" identity." *Id.* Parent A does not allege any specific outside observer <u>actually</u> believes their child is confused about their gender, nor does Parent A claim anyone in the District has ever taken any action to provide their student with a gender support plan. *See* App. 39-43; R. Doc. 3-2 at 1-5.

PDE's reliance on Parent A suffers from an additional defect— Parent A's child is no longer enrolled in the District. *See* App. 42; R. Doc. 3-2 at 4. Because Parent A does not have a child in the District, Parent A does not have standing and PDE cannot rely on Parent A for associational standing in this action. *See Hunt v. Wash. State Apple Advert. Comm'n,* 432 U.S. 333, 343 (1977); *see also Clapper*, 568 U.S. at 416. PDE argues that Parent A has standing despite voluntarily transferring their student out of the District, citing *Federal Election Commission v. Cruz* to argue that "injuries that a party purposely incurs" can still support standing. *Id.* (citing *Fed. Election Commn. v. Cruz*, 212 L. Ed. 2d 654 (May 16, 2022)). That case is inapposite. Parent A did not inflict a purposeful injury in order to generate standing, Parent A has no injury at all because their child is no longer enrolled in the School District. Because Parent A withdrew their child "based on their fears of hypothetical future harm," Parent A does not have standing.

Appellate Case: 22-2927   Page: 21   Date Filed: 12/08/2022 Entry ID: 5225286

Parent B is similarly concerned that their high-school-aged child, who has unidentified special needs, "will do or say something that will be interpreted as an assertion of a gender identity by Linn-Mar official who do not know her as well as [Parent B does]." App. 45; R. Doc. 3-3 at 2. Parent B is also concerned that their child is "at risk" of receiving a gender support plan under the Administrative Regulations.[1] Parent B does not allege that any Linn-Mar official has interpreted their student to have a different gender identity or that anyone in the District has taken any action to provide the student with any gender support measure. *See* App. 44-48; R. Doc. 3-3 at 1-5. Parent B provides no basis for their fears regarding the District's hypothetical actions, other than that the Administrative Regulations exist.

Parent C's fear is that their daughter is at "substantial risk" of receiving a gender support plan or other gender identity-related accommodations against Parent C's wishes "based on [their] daughter's particular life experiences and … conversations with her." App. 50; R. Doc. 3-4 at 2. Parent C does not believe that their high school-aged daughter will inform Parent C about issues involving her gender identity because their daughter knows that Parent C has "strong feelings about this topic." App. 52; R. Doc. 3-4 at 4. Parent C is concerned the School District will "prioritize" the student's

_____

[1] Under the Administrative Regulations, students do not "receive" a Gender Support Plan unless requested by the student and/or their parent or guardian, and such supports are considered on a case-by-case basis. App. 477, R. Doc. 15-4; App. 483, R. Doc. 15-3.

Appellate Case: 22-2927   Page: 22   Date Filed: 12/08/2022 Entry ID: 5225286

preferences over her parent's and not inform Parent C. App. 51; R. Doc. 3-4 at 3. Again, Parent C offers no facts to suggest anyone in the District has done anything regarding their child's gender, nor does Parent C provide specific facts to substantiate their concerns regarding their child's gender identity. *See* App. 49–53; R. Doc. 3-4 at 1–5.

None of these parents alleged <u>any</u> facts showing that their children have utilized the Administrative Regulations in any way, nor do the parents allege any facts showing that their children have requested the School District take any action with respect gender identity. As the district court explained, PDE's theory of standing for Parents A–C requires the following layers of conjecture: (1) their child will express a desire for or indicate by mistake a desire for a plan; (2) the District will give the child a plan; (3) without Parents A–C's consent or knowledge; (4) and the District will hide or lie when the parent asks for information regarding their child's gender. *See* App. 533–34; R. Doc. 38 at 19–20. PDE presented no evidence that any of these facts had occurred or that there was any significant risk of these issues occurring. This level of speculation cannot support standing. *Sch. of the Ozarks, Inc.*, 41 F.4th at 1000 ("This is the kind of 'highly attenuated chain of possibilities' that 'does not satisfy the requirement that the threatened injury must be certainly impending.'" (citing *Clapper*, 568 U.S. at 410).

PDE's claim about the level of risk facing its member-parents is undercut by the plain language of the Policy. PDE argues insistently, without any evidentiary

Appellate Case: 22-2927    Page: 23    Date Filed: 12/08/2022 Entry ID: 5225286

support, that the Administrative Regulations require the District to keep information regarding a student's gender support plan "hidden or denied when parents ask," a claim that is directly contradicted by the plain language of the policy and the testimony of the District's superintendent. *See* generally App. 477–84; R. Doc. 15-4; R. Doc. 15-5 at 2. As discussed more thoroughly below, PDE presented no facts to the district court on its motion for preliminary injunction that contradicted the District's evidence regarding the implementation of the Administrative Regulations, instead relying solely on the parents' hypothetical fears about the nature of the policy.

Because Parents A–C have failed to show a sufficient concrete and particularized injury to satisfy the standing requirement, PDE cannot make a threshold showing that it is likely to have standing in this action. Accordingly, the district court correctly ruled that PDE was unlikely to succeed on the merits of its claim due to lack of standing.

### B. Parents D–G Did Not Provide Sufficient Facts to Support a Finding They Have Suffered an Injury.

The district court correctly found that Parents D–G failed to show standing because, again, PDE failed to present sufficient facts to support a finding of injury. App. 532; R. Doc. 38 at 18. PDE argues the district court applied the wrong legal standard to its analysis of standing because this is a pre-enforcement action. Appellant's Br. at 24. PDE claims its members' children's speech rights have been

24

chilled by the Policy and, therefore, PDE has standing to bring these claims. PDE is incorrect and the district court should be affirmed.

The speech concerns alleged by PDE do not give rise to standing. When bringing a pre-enforcement action, a plaintiff must allege "an intention to engage in a course of conduct arguably affected with a constitutional interest." *Susan B. Anthony*, 573 U.S. at 161. "Self-censorship may amount to an injury in fact for purposes of standing if the plaintiff has been "objectively reasonably chilled from exercising his First Amendment right to free expression in order to avoid enforcement consequences." *Ft. Des Moines Church of Christ v. Jackson*, 215 F. Supp. 3d 776, 786–87 (S.D. Iowa 2016) (quoting *Republican Party of Minn. v. Klobuchar*, 381 F.3d 785, 792 (8th Cir. 2004)). However, for a party to face a credible threat of enforcement, the "allegedly chilled course of conduct must be proscribed by the challenged statute." *Id.*; *see also Susan B. Anthony*, 573 U.S. at 160. Where the allegedly chilled conduct is not proscribed, a party does not have standing to pursue his claim. *See id.* "A plaintiff can establish an injury in the First Amendment context in two ways: by identifying protected speech in which it would like to engage but that is proscribed by statute, or by self-censoring to avoid the credible threat of prosecution." *Sch. of the Ozarks, Inc*, 41 F.4th at 1000 (citing *Missourians for Fiscal Accountability v. Klahr*, 830 F.3d 789, 794 (8th Cir. 2016)).

Appellate Case: 22-2927     Page: 25     Date Filed: 12/08/2022 Entry ID: 5225286

Parents D–G claim to be worried that their children will be forced to "affirm" the chosen gender identity of a classmate against their personal beliefs and will be disciplined for not doing so. *See* App. 54–69; R. Doc. 3-5–3-8. Parent D states that they are concerned their high school-aged child will be punished "for expressing an opinion about the nature of biological sex, declining to use another student's 'preferred pronouns,' or disagreeing with another student's assertion about whether they are male or female." *See* App. 55; R. Doc. 3-5 at 2. Parents E and F are concerned their elementary school-aged child will be disciplined for "referring to another student according to their biological sex rather than their gender identity or for merely expressing discomfort about sharing bathrooms with teachers or students of the opposite biological sex." App. 59, 63; R. Doc. 3-6 at 2, 3-7 at 2. Parent G is concerned that their high school-aged child will be disciplined:

> for a number of views he wants to express, such as referring to another student according to their biological sex rather than their gender identity, disagreeing with another student's assertion about whether they are male or female, stating that a biological male who identifies as female should not be allowed to compete in women's sports, or for expressing discomfort about sharing bathrooms with teachers or students of the opposite biological sex."

App. 67; R. Doc 3-8 at 2.

None of the above concerns satisfy both the requirements that the student speech at issue is (1) protected speech under the First Amendment or (2) protected speech that is reasonably objectively chilled by the Policy. The majority of the above

26

speech PDE complains of being chilled is not proscribed by the Policy. The only speech punished by the Policy is an "intentional and/or persistent refusal…to respect a student's gender identity" by using a student's preferred name or pronouns, which constitutes a violation of the District's anti-bullying and anti-harassment policies. *See* App. 478; R. Doc. 15-4 at 2; *see also* App. 537-38; R. Doc. 38 at 23–24. General opinions on the topics of biological sex, participation in sports, and even the use of bathroom facilities are not arguably proscribed by the Policy. *See id.* Therefore, PDE cannot show the Policy has had an "<u>objectively reasonable</u> chilling effect" on student speech. *Turkish Coal.*, 678 F.3d at 622.

On the other hand, PDE likewise fails to demonstrate standing where the allegedly chilled speech is not constitutionally protected. *See Balogh v. Lombardi*, 816 F.3d 536, 542 (8th Cir. 2016) ("A chilling effect on <u>speech protected by the First Amendment</u> can constitute an injury in fact, but allegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm." (cleaned up and quotations omitted) (emphasis added)).  A student engaging in harassment or bullying on the basis of gender is not engaging in constitutionally protected speech within the school environment. *See Bethel Sch. Dist. No. 403 v. Fraser,* 478 U.S. 675, 683 (1986).

Because harassing speech on the basis of protected class is not protected and Parents D-G's students remain otherwise free to share their views on gender, there

has been no reasonably objective chilling effect on protected speech. As the district court pointed out, PDE failed to show that any student's speech "resulted in discipline under the Policy, that they have been threatened with discipline directly if they do express their views on gender identity, or that the Policy's requirement of respecting another's gender identity relates to anything other than students' names or pronouns." App. 533; R. Doc. 38 at 19. PDE's member-parents fears that their children will be disciplined for expressing <u>general</u> beliefs about biological sex and gender are entirely speculative. *See Turkish Coal.,* 678 F.3d at 622 (finding a party's claimed injury was "far too speculative to establish an *objectively reasonable* chilling effect"). Because a "[f]ear of hypothetical future harm to plaintiff's members and their children is not enough to sufficiently allege an injury in fact on these facts," the district court correctly held that Parents D–G had failed to show standing. *See id.*

## C. PDE Cannot Show Causation or Redressability.

The district court correctly held that PDE failed to plead and support "sufficient factual allegations to find causation" because no injury occurred under the Policy. App. 534; R. Doc. 38 at 20. PDE cites nothing in the record to support that such finding was an abuse of discretion. As recognized by PDE's cited authority:

> The judicial task of determining causation can be imprecise at times (and 'imprecise' is probably a generous description). Courts must make a predictive judgment about a notoriously difficult issue—causation—based merely on the complaint and

28

declarations. When performing that inherently imprecise task of predicting or speculating about causal effects, common sense can be a useful tool.

*Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 6 (D.C. Cir. 2017). Given that the district court found nothing in the record to support a finding of causation, and PDE has cited to nothing on appeal, the district's court ruling must be affirmed.

Even if the Court were to find PDE has satisfied causation at this stage of the litigation, PDE cannot show its requested relief will redress its purported injuries. PDE requested the following relief from the district court:

- A declaratory judgment that the Policy violates the First and Fourteenth Amendments;
- A preliminary injunction barring Defendants from enforcing the Policy;
- A permanent injunction barring Defendants from enforcing the Policy.

App. 28; R. Doc. 1 at 28. However, even if PDE is granted the above requested relief, Parents A–C's underlying concerns about their students' gender preferences and Parents D–G and their student's concerns about potential disciplinary action for discrimination or harassment will not be resolved. Even in the absence of the Policy, the School District is required to comply with state and federal laws, including all applicable antidiscrimination provisions, in addition to other applicable School District policies.

As the district court correctly noted, "[e]ven if the Policy did not exist or an injunction were granted, the law still expressly prohibits discrimination in Iowa public schools based on gender identity." App. 534; R. Doc. 38 at 20. The Iowa Civil

29

Rights Act protects students from discrimination in education on the basis of, among other things, "sex, sexual orientation, [and] gender identity." Iowa Code § 216.9. The United States Department of Education has issued interpretive guidance that "Title IX prohibits discrimination based on sexual orientation and gender identity," citing the *Bostock v. Clayton County* decision prohibiting discrimination based on gender identity under Title VII. *See* U.S. Dept' of Educ., *Notice of Interpretation*, 86 Fed. Reg. 32637 (June 22, 2021). Iowa school districts are also required to promulgate policies prohibiting harassment, discrimination, and bullying on the basis of protected class, including gender identity. Iowa Code § 280.28; *see also* App. 485–92; R. Doc. 15-6 at 1-8. PDE also has not challenged Board Policy No. 504.13, Transgender and Students Nonconforming to Gender Role Stereotypes. App. 476; R. Doc. 15-3 at 1. Under that policy, the School District "will consider and assess the needs and concerns of each student on an individual bases in consultation with parents, when appropriate." *See id.* Because PDE did not challenge that broader policy, its requested relief will not redress any alleged injury its member-parents have suffered as a result of the implementation of the Policy.

Therefore, even if PDE had succeeded in securing injunctive relief and prevented the Policy from going into effect, the School District still has a duty under the law and other applicable School District policies to ensure students are not subjected to any unlawful discrimination. This includes actions such as ensuring

students are called by their preferred pronouns, provided access to bathrooms corresponding to their gender identity, and are not being subjected to any harassment on the basis of gender identity by their peers or other school personnel. *See e.g., Vroegh v. Iowa Dept. of Corrections*, 972 N.W.2d 686, 695 (Iowa 2022) (upholding a jury verdict for gender identity discrimination where a transgender employee had been denied the use of the bathroom that corresponded with his gender identity); *see also* U.S. Dept' of Educ., *Notice of Interpretation*, 86 Fed. Reg. 32637; U.S. Dep't of Educ., *Supporting Transgender Youth in School*, https://www2.ed.gov/about/offices/list/ocr/docs/ed-factsheet-transgender-202106.pdf (June 2021) (recommending that schools adopt "policies that respect all students' gender identities—such as the name the student goes by, which may be different from their legal name, and pronouns, that reflect a student's gender identity—and implementing policies to safeguard students' privacy. This document also notes that some school develop gender support and communication plans "to ensure a supportive environment for transgender students"); U.S. Dept' of Educ. Office for Civil Rights, *Confronting Anti-LGBTQI+ Harassment in Schools: A Resource for Students and Families*, https://www2.ed.gov/about/offices/list/ocr/docs/ocr-factsheet-tix-202106.pdf (June 2021) (including, as examples of the types of complaints of discrimination that OCR will investigate, (1) students refusing to use a transgender student's chosen name

31

and pronouns and (2) school staff refusing to allow a transgender student use a bathroom in accordance with the student's gender identity); Iowa Civil Rights Commission, *Sexual Orientation & Gender Identity: An Education Provider's Guide to Iowa Law Compliance*, https://icrc.iowa.gov/sites/default/files/publications/2018/SOGI_Education_May18.pdf (last accessed Aug. 24, 2022) (noting that harassing conduct based on gender identity includes behavior engaged in by other students); Iowa Civil Rights Commission, *Sexual Orientation & Gender Identity: A Public Accommodations Provider's Guide to Iowa Law*, https://icrc.iowa.gov/sites/default/files/publications/2018/SOGI_Public_Accommodation_May18.pdf (last accessed Aug. 24, 2022) (noting that restrooms and locker rooms must be made available on the basis of their gender identity and that harassment can include "intentional use of names and pronouns inconsistent with a person's presented gender").

PDE argues that a preliminary injunction would redress its injuries because "[i]f the District is enjoined from doing something because it violates the Constitution; the District cannot rely on another state statute to continue doing the same unconstitutional actions." Appellant's Br. at 26. It appears PDE, then, is asking the Court to reverse the district court's decision denying a motion for preliminary injunction and instead grant an injunction that would prevent the overall

enforcement of the Iowa Civil Rights Act, Title IX, and likely Title VII by finding that a School District violates the Constitution if it prohibits bullying and harassment on the basis of gender or provides accommodations to transgender students upon request. Such an argument was not made to the district court and is entirely unjustified in this action. PDE then tried to narrow its argument by simply claiming the School District is not required to "take the actions challenged in the Policy."[2] Appellant's Br. at 27. PDE does not state what actions specifically it believes the School District could simply elect not to take. As noted above, the School District would act unlawfully if it engaged in discriminatory actions against students, even at the behest of the students' parents, and it could face liability for doing so. Because the School District is required to ensure students are not discriminated against on the basis of gender identity, outside of any provisions contained in the challenged Policy, PDE's requested relief cannot redress any alleged injury asserted in this action. *See Sch. of the Ozarks, Inc*, 41 F.4th at 1001 (affirming the denial of a preliminary injunction where a plaintiff's requested relief of enjoining an internal Housing and Urban Development memorandum failed to demonstrate redressability because "the agency retains the authority and responsibility to carry out the same

---

[2] PDE also again claims that the Policy prohibits and punishes students for mere misgendering, which mischaracterizes the Policy's prohibition on only "intentional and/or persistent refusal" to respect a student's chosen name. *See* App. 537-38; R. Doc. 38 at 23-24.

33

enforcement activity" based on other statutes). Accordingly, PDE cannot satisfy this element of standing and its claims fail.

### III. The Policy Does Not Violate Students' Speech Rights Protected Under the First and Fourteenth Amendments.

The district court did not abuse its discretion in determining that the PDE has not shown a fair chance of prevailing on its speech claims. Accordingly, denial of Appellant's request for injunctive relief was appropriate and should be affirmed.

#### A. The Policy Does Not Compel Speech.

The district court did not abuse its discretion in determining that "no speech is compelled by the Policy." App. 510; R. Doc. 28 at 9. The district court correctly noted that (1) the Policy does not require students to speak to other students at all; (2) to the extent that one student talks to another, the Policy does not require that they refer to other students by names or pronouns; and (3) students can use the "universal word 'they,' which is often used to refer to a person or people regardless of whether that person uses 'they' as a pronoun." *Id.*

This case is easily distinguished from *West Virginia Board of Education v. Barnette*, where state regulations required students to affirmatively say the Pledge of Allegiance while saluting the flag. *See* 319 U.S. 624, 628–29 (1943). Failure to do so was punishable by expulsion of the student from school and incarceration of the parent. *Id.* at 629. Where *Barnette* involved government-mandated speech and action, Appellants can point to no language in the Policy that actually supports their

34

claim that it requires students to "affirmatively declare statements that they believe to be false and affirm ideologies with which they deeply disagree." Appellant's Br. at 33. Nothing in the Policy requires students to state any belief, ideology, or opinion relating to gender or biological sex—it simply requires that, to the extent that any student chooses to address any other specific student, they do so by using the preferred name and pronouns of that student.

Requiring students to engage each other in a manner that is respectful and nondiscriminatory is not tantamount to compelled speech and is well within the boundaries of the First Amendment. Because schools have "comprehensive authority…, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools," *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 507 (1969) (citing *Epperson v. Arkansas*, 393 U.S. 97, 104 (1968); *Meyer v. Nebraska*, 262 U.S. 390, 402 (1923)), and because "[a] school need not tolerate student speech that is inconsistent with its 'basic educational mission'" *Hazelwood Sch. Dist. v Kuhlmeier*, 484 U.S. 260, 267 (1988) (quoting *Fraser*, 478 U.S. 675, 685 (1986)), it is wholly reasonable and consistent with the First Amendment that schools can require students to address each other in a civil manner that does not constitute discrimination or harassment on the basis of a protected class. *See also Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 655 (1995) (emphasizing that the authority of the State over school children is "custodial and tutelary, permitting a

35

degree of supervision and control that could not be exercised as adults."). Indeed, the Court has explicitly recognized that it is the role of the school system to "inculcate the habits and manners of civility," *Fraser*, 478 U.S. at 684, which includes referring to another student in a manner that is preferred by that student. PDE's apples-to-oranges reliance on cases outside of the school context, *see* Appellant's Br. at 34, demonstrates its failure to recognize the Court's historical treatment of student speech in schools as fundamentally distinct from speech outside the school setting. *See also* App. 537; R. Doc. 38 at 23.

PDE refers to *Meriwether v. Hartop*, 992 F.3d 492, 501 (6th Cir. 2021), as "directly on point." Appellant's Br. at 33. It is, in fact, readily distinguishable from the present case. In *Meriwether*, a university professor proposed to use a student's last name or to note his disagreement with the use of preferred pronouns in his syllabus, but the university told him that would violate the college's policy. 992 F.3d at 501. Ultimately, the professor was disciplined for violating the university's nondiscrimination policy. *See id.* The Sixth Circuit reversed the district court's grant of the university's motion to dismiss, noting that the university had forbidden the professor from describing his views on gender identity and therefore "silenced a viewpoint that could have catalyzed a robust and insightful in-class discussion." *See id.* at 506. The issues presented in that case included academic freedom for university

professors, the regulation of employee speech, and the rejection of an employee's religious beliefs—issues which are simply absent from this action.

Both federal and state law acknowledge that schoolchildren are different from their adult counterparts, and that different legal standards govern school authority over student conduct. *See, e.g.*, *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 652 (1999) (in the context of school district liability for student-on-student harassment, the Court stated, "Indeed, at least early on, students are still learning how to interact appropriately with their peers…. Damages are not available for simple acts of teasing and name-calling among school children, however, even where these comments target differences in gender. Rather…, damages are available only where the behavior so severe, pervasive, and objectively offensive that it denies its victims the equal access to education that Title IX is designed to protect."); *Fraser*, 478 U.S. at 683 (holding that a school may restrict speech that is not obscene but is lewd and vulgar and thus inappropriate for a younger audience. "The school, as instruments of the state, may determine that the essential lessons of civil, mature conduct cannot be conveyed in a school that tolerates lewd, indecent, or offensive speech…. The speech could well be seriously damaging to its less mature audience…."); *Morse v. Frederick*, 551 U.S. 393, 404–05, 408 (2007) (holding that a school could restrict student speech that could be interpreted as promoting illegal drug use, and noting *Fraser* demonstrated that "'the constitutional rights of students

37

in public school are not automatically coextensive with the rights of adults in other settings.' Had Fraser delivered the same speech in a public forum outside the school context, it would have been protected. In school, however, Fraser's First Amendment rights were circumscribed 'in light of the special characteristics of the school environment.'" (internal citations omitted)). In light of the foregoing, the Sixth Circuit's ruling in *Meriwether* simply does not apply in the K-12 context.

The Policy does not "force the children of Parents D–G to 'mouth support' for beliefs they do not hold," as claimed by PDE. *See* Appellant's Br. at 33 (quoting *Janus v. Am. Fed'n of State, County, and Mun. Employees, Council 31*, 138 S. Ct. 2448, 2453 (U.S. 2018)). Requiring a student to refer to another student by that student's preferred name and pronouns is not a "belief"—it is a matter of basic civility within school regulatory authority. *See Fraser*, 478 U.S. at 684. PDE has provided no authority that these restrictions violate the Constitution. Accordingly, the district court's ruling should be affirmed.

### B. The Policy Does Not Constitute Content or Viewpoint Discrimination.

PDE claims that the Policy in unconstitutional because it "prohibit[s] the expression of an idea" that is "offensive or disagreeable." *See* Appellant's Br. at 36. Here again, PDE mischaracterizes the Policy, which does not prohibit the expression of an "idea" but rather requires that, to the extent one student addresses another, they must do so in the manner preferred by that student. The Policy states that "intentional

38

and/or persistent refusal…to respect a student's gender identity" by using another student's preferred name or pronouns is a violation of the District's anti-bullying and anti-harassment policies. *See* App. 478, 537-38; R. Doc. 15-4 at 2, R. Doc. 38 at 23-24.

As the district court correctly noted, the policy is content and viewpoint neutral:

> Though the policy is geared toward protecting transgender and nonbinary students, the Names and Pronouns provision, from a plain reading, applies to misuse of any student's name or pronouns, including those who identify as cisgender. The provision appears to apply with equal force to someone named Nathaniel who prefers the nickname Nate as it does to a transgender individual who wishes to go by a name different from their legal or birth name. The Names and Pronouns provision provides that whatever name Nate provides to staff as part of his gender identity, it should be used, and any "intentional and/or persistent refusal by staff or students to respect a student's gender identity is a violation of school board policies[.]" More concretely, if Nate is a cisgendered male, the Policy bars anyone from calling Nate "her."

App. 537–38; R. Doc. 38 at 23–24.

PDE fails to acknowledge the applicability of *Tinker* and its progeny to Appellant's speech claims. While it is undisputed that "students…[do not] shed their constitutional rights to freedom of speech or expression at the schoolhouse gate," *Tinker* clearly demonstrates that schools may restrict student speech where it "materially disrupts classwork or involves substantial disorder *or invasion of the rights of others*." *Tinker*, 393 U.S. at 513 (emphasis added).

39

"[T]he Court has repeatedly emphasized the need for affirming the comprehensive authority of the States and of school officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools." *Id.* at 507 (citing *Epperson*, 393 U.S. at 104); *Meyer*, 262 U.S. at 402). This is due to the "special characteristics of the school environment." *See Kuhlmeier*, 484 U.S. at 267 (citing *Tinker*, 393 U.S. at 506; *cf. New Jersey v. T.L.O.*, 469 U.S. 325, 342-43 (1985) (holding that a search of a student in school need not "require strict adherence to the requirement that searches be based on probable cause" under the Fourth Amendment)). The Court has routinely acknowledged that "the First Amendment rights of students in the public schools 'are not automatically coextensive with the rights of adults in other settings.'" *Kuhlmeier*, 484 U.S. at 267 (quoting *Fraser*, 478 U.S. at 682). "A school need not tolerate student speech that is inconsistent with its 'basic educational mission'…even though the government could not censor similar speech outside the school." *Id.* (citing *Fraser*, 478 U.S. at 685).

The Court recently affirmed in *Mahanoy Area School District v. B.L.* that the First Amendment must be applied in light of the special characteristics of the school environment; "[o]ne such characteristic…is the fact that schools at times stand *in loco parentis*, *i.e.*, in the place of parents." 141 S. Ct. 2038, 2044-45 (2021). Although the Court struck down the school's action against B.L., it did so on

40

completely different grounds than those presented by PDE. In *B.L.*, the Court determined that the student's off-campus speech was wholly separate from the school's sphere of authority. *Id.* at 2045. The *B.L.* Court made clear, however, that even though off-campus speech is normally beyond the purview of a school district's authority, "[t]he school's regulatory interests remain significant in some off-campus circumstances...include[ing] serious or severe bullying or harassment targeting particular individuals." *Id.*

PDE cites the Third Circuit's ruling in *Saxe v. State College Area School District*, claiming it supports their proposition that "courts regularly enjoin similar attempts to violate student speech rights" through harassment policies. *See* Appellant's Br. at 36 (citing *Saxe*, 240 F.3d 200, 206 (3d Cir. 2001)). The *Saxe* ruling does not support Appellant's sweeping claim that the Policy is unconstitutionally overbroad. In *Saxe*, the court found the anti-harassment policy in question to be unconstitutional because it went beyond legally protected characteristics and prohibited disparaging comments relating to things like clothing, appearance, hobbies and values. *Id.* at 210. Furthermore, the *Saxe* court noted that "preventing discrimination in the workplace—and in the schools—is not only a legitimate, but a compelling, government interest. And, as some courts and commentators have suggested, speech may be more readily subject to restrictions when a school or workplace audience is 'captive' and cannot avoid the objectionable speech." *Id.* at

41

209-10 (citations omitted). The dicta in *Saxe* relied upon by Appellants is not applicable to the Policy, because the Policy is intended to prevent bullying and harassment on the basis of gender identity—a characteristic expressly protected under federal and state law. *See* Title IX of the Education Amendments Act of 1972, 20 U.S.C. §§ 1681 *et seq.*; Iowa Civil Rights Act, Iowa Code § 216.9; Iowa Code § 280.28.

In this case, the Policy was enacted to prevent an invasion of the rights of other students by explaining that an "intentional and/or persistent" refusal to use the preferred name and pronouns of another student would constitute bullying and/or harassment under other existing School District policies. Contrary to Appellant's assertion, the Policy does not "forbid[] students from expressing their political or moral beliefs," it simply precludes them from targeting individual students with harassing conduct. There is a distinction between saying, "biological sex is immutable," and refusing to address another student by their preferred name and pronouns.

PDE cites to the policies of other schools and institutions of higher education to support their proposition that the Policy at issue in this case is unconstitutional. Those policies are irrelevant to this case. PDE is challenging only the School District's Policy 504.13R, and they may only succeed on the merits of their claims

42

if they can show that Policy 504.13R unlawfully restricts student speech. This, they

cannot do. As the district court correctly stated:

> Plaintiff has not shown facts indicating expression of views of any kind will be disciplined or that their expression will be limited under the Policy. The Policy itself has not been shown to penalize students for expressing views that there are two genders or that gender dysphoria does not exist, nor that it penalizes opposite expression. It has only been shown to penalize students for conduct directed at a specific individual in relation to their name and pronouns. Again, even if the Policy restricts free speech rights of students to some degree, schools have more leeway to do so in a school setting.

App. 511; R. Doc. 28 at 10.

Students have the right under federal and state law to be free from

discrimination and harassment based on gender identity. *See* 20 U.S.C. §§ 1681 *et*

*seq.* (Title IX); Iowa Code § 216.9; Iowa Code § 280.28 (prohibiting bullying and

harassment in schools "which is based on any actual or perceived trait or

characteristic of the student," including "gender identity"). School officials must

strike a balance between the competing rights of students; the Policy does exactly

this. The only section of the Policy that addresses other students' speech is located

in the section entitled "Names and Pronouns," and states that "An <u>intentional and/or</u>

<u>persistent refusal</u> by staff or students to respect a student's gender identity is a

violation of school board policies 103.1 Anti-Bullying and Anti-Harassment, 104.1

Equal Educational Opportunity and 104.3 Prohibition of Discrimination and/or

Harassment based on Sex Per Title IX." App. 478; R. Doc. 15-4 at 2 (emphasis added). In this context, the district court correctly noted that:

> Plaintiff has not shown the Policy is intended to discipline accidental misuse, jokes, or opinions related to gender identity in general. On its face, the Policy provides that a student will be punished for intentional and repeated misuse of a name or pronoun and behavior targeting specific people…on the basis of their gender or name.

App. 511; R. Doc. 28 at 10.

Even in a facial challenge, PDE must show that the Policy seeks to restrict <u>protected</u> speech based on content or viewpoint. It has failed to do so. The district court correctly found that there was no evidence that the plain language of the Policy allowed for penalizing students for expressing ideas or views, as opposed to "conduct directed at a specific individual in relation to their name and pronouns, as part of their gender identity." Add. 24. The latter is not protected speech in the school setting to the extent that it interferes with the rights of other students. *See Tinker*, 393 U.S. at 513. PDE's argument about the Policy is not rooted in the language of the Policy itself, but in PDE's own speculative belief that the School District would exceed the plain language of its own Policy. Mere speculation cannot form the basis for enjoining the Policy. *See Sch. of the Ozarks, Inc.*, 41 F.4th at 1000.

### C. The Policy is Not Overbroad or Vague.

PDE argues that the Policy is overbroad because it could be used to prohibit protected speech. Appellant's Br. at 39. However, a policy is facially overbroad

44

under the First Amendment only "when no application of the policy would be constitutional or where a substantial number of the policy's potential applications would be unconstitutional in relation to the policy's legitimate sweep."  App. 538; R. Doc. 38 at 24 (citing *Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2387 (2021)). PDE has not met its burden of proof, because it cannot show that the Policy "is intended to discipline accidental misuse, jokes, or opinions related to gender identity in general. On its face, the Policy provides that a student will be punished for intentional and repeated misuse of a name or pronoun and behavior targeting specific people…on the basis of their gender," which is prohibited by federal and state law. *See* App. 538-39; R. Doc. 38 at 24-25. The district court noted that "the purpose of the Policy is to protect students who are transgender or nonbinary from harassment and bullying, based on their names and pronouns…. There is nothing in the record currently to indicate the Policy is being applied beyond its legitimate sweep." App. 539; R. Doc. 38 at 25. Accordingly, PDE cannot show a fair probability of success in proving the Policy is facially overbroad, as the district court correctly recognized.

PDE also argues that the Policy is overbroad because it "does not limit its reach to speech made on school grounds." Appellant's Br. at 39. However, the Policy, which consists of administrative regulations, expressly cross-references the School District's existing bullying and harassment policies, which PDE does not

challenge or seek to enjoin in this action.[3] Those policies already address the permissible scope of the School District's regulatory authority. *See, e.g.*, App. 485; R. Doc. 15-6 at 1 (the District's anti-bullying, anti-harassment policy prohibits bullying or harassing behavior "while on school property, while on school-owned or sanctioned activities, and while away from school grounds if the conduct materially interferes with the orderly operation of the educational environment or is likely to do so."). Because the challenged Policy explicitly defers to the School District's other already-existing policies and procedures for addressing bullying and harassment, the Policy itself need not set forth every matter that is already addressed in those other policies that PDE does not seek to enjoin.

To the extent that PDE attempts to classify the Policy as vague, the district court demonstrated that it is not:

> Though the word "respect" could mean a variety of things, the context it is used in and its position in the sentence indicates "respect" means "will acknowledge or honor through use of." (Doc. 1-1, at 4). Given its position under a section about names and pronouns, it appears "respect" means students and staff members must use a student's preferred name and pronouns when speaking to or about them at school. Plaintiff has not shown evidence supporting the idea that the provision, on its face, applies to any other scenario. Plaintiff has not shown a fair probability that students or staff are not on notice of what behavior violate the Policy given a plain reading of the Policy provision.

---

[3] PDE's belief that schools may only regulate speech occurring on school grounds is incorrect. *See, e.g.*, *B.L.*, 141 S. Ct. at 2045.

Appellate Case: 22-2927    Page: 46    Date Filed: 12/08/2022 Entry ID: 5225286

App. 539-40; R. Doc. 38 at 25-26. Because the district court did not err in denying PDE's motion for preliminary injunction on its First Amendment claim, the ruling of the district court should be affirmed.

### D. The Policy Does Not Violate Parents' Rights Under the Fourteenth Amendment.

PDE has not demonstrated a fair probability of success on the merits of its Fourteenth Amendment claims on behalf of Parents A–C. PDE's member-parents have not been deprived of any protected liberty interest. Furthermore, PDE's argument that parents are entitled to unlimited information affirmatively provided by the School District is unsupported by law. Because PDE cannot show a fair probability of success on the merits, the district court correctly denied PDE's motion for preliminary injunction.

The Fourteenth Amendment "specially protects those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition." *Washington v. Glucksberg*, 521 U.S. 702, 703 (1997). "Substantive due process analysis must begin with a careful description of the asserted right, for the doctrine of judicial self-restraint requires us to exercise the utmost care whenever we are asked to break new ground in this field." *Reno v. Flores*, 507 U.S. 292, 302 (1993) (citations, alterations, and internal quotation marks omitted). Courts recognize that parents have the "right to direct the education and upbringing of one's children." *Stevenson v. Blytheville Sch. Dist. #5*, 800 F.3d 955, 967 (8th Cir. 2015). But this is a "limited"

47

right, "neither absolute nor unqualified." *Id*. Where a school district "has not restricted the [appellants'] constitutional right to educational choice" and parents have "freely chosen" to enroll children in a public school district, a parent's liberty interest has been satisfied. *See id.* at 967.

PDE relies heavily on the Supreme Court's decisions in *Meyer*, *Pierce*, and *Troxel* to support its argument that the Policy violates the fundamental rights of parents in the School District to direct the upbringing of their children. *See* Appellant's Br. at 28. However, *Meyer* merely dealt with a parent's "right to send one's child to a private school that offers specialized training" and *Pierce* "simply 'affirmed the right of private schools to exist….'" *See Runyon v. McCrary*, 427 U.S. 160, 177 (1976) (quoting *Norwood v. Harrison*, 413 U.S. 455, 462 (1973)). *Pierce* lends "'no support to the contention that parents may replace state educational requirements with their own idiosyncratic views of what knowledge a child needs….'" *Runyon*, 427 U.S. at 177 (quoting *Wisc. v. Yoder*, 406 U.S. 205 (1972)). *Troxel* is a plurality opinion that had nothing whatsoever to do with a parent's right to control their child's education in a public school system. *See* 530 U.S. 57 (2000). Instead, *Troxel* addressed a "breathtakingly broad" state statute allowing "any person" to petition a court for visitation rights of a child "at any time." *See id.* at 67. As such, none of these cases specifically support Appellant's position.

The recent district court ruling in of *John and Jane Parents 1 v. Montgomery*

*County Board of Education*, Case No. 8:20-3552-PWG, 2022 WL 3544256, *slip op.*

(D. Md. Aug. 18, 2022), is directly on-point. In that case, three parents of students in

the Montgomery County Public Schools alleged that the school's "Student Gender

Identity" guidelines violated their constitutional rights as parents. *Id.* at *1. The court

disagreed and dismissed plaintiffs' claims. Applying rational basis review,[4] the court

found that the school district's policy "easily meets that standard. [The school district]

certainly has a legitimate interest in providing a safe and supportive environment for

all [] students, including those who are transgender and gender nonconforming. And

the guidelines are certainly rationally related to achieving that result." *Id.* at *13. The

court further noted that even if strict scrutiny applied, the guidelines were "narrowly

tailored in furtherance of a compelling governmental interest" to protect student safety,

ensure a safe, welcoming school environment, not discriminating against students on

---

[4] Following an extensive analysis, the court explained that "the Supreme Court has stated consistently that parents have a liberty interest, protected by the Fourteenth Amendment, in directing their children's schooling. Except when the parents' interest includes a religious element, however, the Court has declared with equal consistency that reasonable regulation by the state is permissible even if it conflicts with that interest. **That is the language of rational basis scrutiny**." *Montgomery County Bd. of Educ.*, at *9 (quoting *Herndon v. Chapel Hill-Carrboro Bd. of Educ.*, 89 F.3d 174, 178 (4th Cir. 1996)).

PDE has not expressly asserted a free exercise of religion claim. While several *amici curiae* briefs raise religious claims under the First Amendment, these should not be addressed by the Court as they were not raised or properly preserved below.

the basis of gender identity, and protecting student privacy. *Id.*[5]

PDE argues that the Policy "deprives parents of the right to have input or control over fundamental decisions concerning gender identity." Appellant's Br. at 29. This is a "selective reading that distorts the [Policy] into a calculated prohibition against the disclosure of a child's gender identity that aims to sow distrust among [the School District's] students and their families." *Montgomery County Bd. of Educ.*, at *7. The Policy, read as a whole, clearly contemplates communication and involvement between school, students, and their parents. The Policy states that "[c]ommunication with the student and/or parent/guardian is key." App. 477; R. Doc. 15-4 at 1. While the Policy, in furtherance of its objective that all students be provided a "safe, affirming, and health school environment," gives priority to the preferences of older students in grades 7–12 over their parents in the supports included in a gender support

---

[5] PDE claims that "in its brief below, the [School] District never claimed that the Policy could survive strict scrutiny." Appellant's Br. at 31. This is false; the same arguments from *Montgomery County Bd. of Educ.* noted above were set forth by the School District in briefing before the district court. The School District agrees that rational basis review is appropriate based on the Court's treatment of parental liberty interest claims within the school setting (as explained in greater detail in Section III(B), *supra*, the Court has routinely found constitutional rights to be more limited in the school setting than outside it), but also posit that the Policy would meet strict scrutiny if applicable because the School District's interest in safeguarding the physical and psychological well-being of minor students is compelling. *See New York v. Ferber*, 458 U.S. 747, 756 (1982). The Policy is narrowly tailored in that it never prohibits, and in fact envisions, parental communication and involvement in a flexible, case-by-case context.

Appellate Case: 22-2927    Page: 50    Date Filed: 12/08/2022 Entry ID: 5225286

plan, nowhere in the Policy does it state that a gender support plan will be denied or withheld from the parents of a child. *See* App. 477–78; R. Doc. 15-4 at 1-2.

Indeed, the Policy explicitly references and upholds a parent's right to access education records under the Family Educational Rights & Privacy Act ("FERPA"), 20 U.S.C. §1232g. App. 478; R. Doc. 15-4 at 2. The Policy provides that a gender support plan will be maintained in the student's temporary records, and that students have a right to privacy that includes the right to keep one's transgender status private at school. *Id.* However, the Policy then states that "[i]nformation about a student's transgender status…may also constitute personally identifiable information contained in a student's education records under [FERPA]. Disclosing this information other than as allowed by law is not permitted. . . . All students under 18 years of age, or those over 18 years of age who are claimed as dependents by their parents/guardians for tax purposes, should be aware that <u>a parent/guardian has the right to review their student's education records under FERPA</u>." *Id.* (emphasis added). By the plain terms of the Policy, parents can access School District records regarding their students' gender identity, including any gender support plan that may exist. PDE's speculative claim that they will be denied such information is meritless.

PDE's claim that the Policy "<u>prohibits</u> the District from telling parents" about a student's transgender status is based on Appellant's misreading of the plain language of the Policy itself." *See* Appellant's Br. at 29. The Policy does not prohibit the School

District from communicating with parents about their child's gender identity. Rather, the Policy prohibits school employees from disclosing information about a student's transgender status to *other* students, parents, and school staff, which is consistent with FERPA. *See* 20 U.S.C. § 1232g(b)(1). Specifically, the Policy states that "[t]he district shall not disclose information that may reveal a student's transgender status to others including but not limited to other students, parents, and school staff[.]" App. 478; R. Doc. 15-4 at 2. In this context, the word "other" modifies students, parents, *and* school staff—it would be grammatically incorrect and cumbersome to repeat "other" in front of each example. A correct reading of this sentence makes clear that the Policy does not "prohibit" the District from communicating with parents about their own children. That was the factual finding of the district court and PDE has presented this Court with no evidence that this finding was an abuse of discretion.

The Policy also directs school employees to "check with the student first before contacting their parent/guardian and directs school employees to "ask the student what name and pronouns they would like school officials to use in communications with their family." *Id.* However, none of these provisions constitutes a prohibition against communication with parents. "Check with the student" and "ask the student" are not synonymous with "lie to their parents." *See id.* The Policy explicitly acknowledges that parents will be provided access to their children's education records, as required by FERPA. *Id.* As the district court correctly noted, "[PDE] and parents do not allege that

52

they have been denied access to information about their minor children nor have they shown any certain impending denial of access." App. 535; R. Doc. 38 at 21.

Additionally, PDE's claim that the Fourteenth Amendment gives them the right to require a school district share all information regarding their child's chosen gender identity is unsupported by any authority and exceeds any reasonable interpretation of the information schools are required to provide. *See, e.g.*, 20 U.S.C. § 1232g(a)(1)(A) (requiring schools receiving federal funding to make the education records of their children available for inspection and review). PDE states that its members "want to ask on a regular basis whether their children have requested or been given a Gender Support Plan, whether their children have made requests or actions have been taken concerning their children's gender identity, and whether the District has any other information that would reveal their children's 'transgender status.'" Appellant's Br. at 29. PDE essentially argues that parents are entitled to notice of any conversation, discussion, or statements involving their child that might implicate their child's gender identity. PDE does not even articulate what information it believes a school district must provide that would "reveal" a student's transgender status.

PDE cites no authority, and the School District is not aware of any, that suggest school employees are required to preemptively report to parents "any information that would reveal [a child's] transgender status." PDE's position that schools must provide parents with limitless information regarding their children is unsupported by any

53

precedent establishing this supposed right. Indeed, the Eleventh Circuit reached the opposite conclusion regarding parental notification of a minor student's pregnancy. In *Arnold v. Board of Education of Escambia County, Alabama*, the Eleventh Circuit held, "a parent's constitutional right to direct the upbringing of a minor is violated when then minor is coerced [by school officials] to refrain from discussing with the parent an intimate decision," in that case, whether to continue or terminate a pregnancy. *See* 880 F.2d 305, 312 (11th Cir. 1989), *overruled on other grounds by Leatherman v. Tarrant County Narcotics Intel. And Coordination Unit*, 507 U.S. 163 (1993). However, the Eleventh Circuit rejected the argument that the Constitution required school officials to notify the parents of a minor who seeks pregnancy counseling. *Id.* at 314. The court stated, "[t]he decision whether to seek parental guidance, absent law to the contrary, should rest within the discretion of the minor." [6] *Id.*

PDE asks this Court to enjoin the Policy in its entirety, yet they have only challenged two portions of the Policy. Although the School District denies that PDE is entitled to *any* injunctive relief, PDE's request is impermissibly overbroad. A request for injunctive relief should be "narrowly tailored to remedy only the specific harms show by the plaintiffs…." *See Huff*, 782 F.3d at 1022–23 (internal quotations and citations omitted). Plaintiff's overbroad request "strongly suggests that their

---

[6] PDE's argument ignores the student's own protected First Amendment right to engage in speech and expression relating to their own gender identity in the school setting, subject only to the limitations of *Tinker* and its progeny.

Appellate Case: 22-2927    Page: 54    Date Filed: 12/08/2022 Entry ID: 5225286

objections to the [Policy] are not limited to the portions" relating to parent communication and student discipline and are instead indicative of their broader intent to "dictate [the District's] curriculum or its approach to student counseling." *See Montgomery Cty. Bd. of Educ.*, at \*12.

Because the district court correctly ruled PDE had failed to satisfy the threshold for injunctive relief, the ruling of the district court should be affirmed.

### E. The District Court Did Not Err in Finding that the Remaining *Dataphase* Factors Weigh Against Granting Injunctive Relief.

#### 1. PDE has failed to show irreparable harm will occur from denial of a preliminary injunction.

"Failure to show irreparable harm is an independently sufficient ground upon which to deny a preliminary injunction." *Let Them Play MN v. Walz*, 517 F. Supp. 3d 870, 887 (D. Minn. 2021) (denying injunctive relief and noting that "a preliminary injunction does not follow as a matter of course from a plaintiff's showing of a likelihood of success on the merits" (quoting *Benisek v. Lamone*, 138 S. Ct. 1942, 1943-44 (2018))) (quoting *Watkins, Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003). PDE must show irreparable harm is "*likely* in the absence of an injunction" and "of such imminence that there is a clear and present need for equitable relief." *Id.* (quotations omitted). A risk of future irreparable harm is not enough; "there must be a clear showing of immediate irreparable injury." *Id.*

55

(quotation omitted). PDE essentially argues that because it believes it can succeed on the merits of its claims, it can demonstrate irreparable harm.

The district court correctly found that PDE failed to show that "there has been or will be impending, certain harm under the Policy." App. 525; R. Doc. 38 at 11. PDE has not shown that there have been disciplinary actions taken against any student, or that gender support plans have been given to the children of Parents A–C, or that Parents A–C have been denied information about their children. *Id.* PDE's speculative fears do not support a finding that harm will occur with "such imminence or such greatness" to constitute irreparable harm. *Id.* (citing *Turkish Coal.,* 678 F.3d at 622). Similarly, PDE's argument that student speech is being chilled is unpersuasive. The district court correctly noted both that PDE failed to demonstrate that <u>protected</u> speech is being chilled by the Policy's prohibition on intentionally and/or repeatedly failing to refer to another student by that student's preferred name and pronouns. *See* App. 526; R. Doc. 38 at 12. Additionally, the court noted that there is no evidence in the record regarding what discipline, if any, might be issued for violations of the Policy that would constitute irreparable harm. *Id.*

### 2. The district court correctly found that the balance of harms disfavors injunctive relief.

As correctly explained by the district court, the balance of harms and public interest factors should be evaluated separately. *See, e.g.*, *D.M. by Bao Xiong*, 917 F.3d at 994; *S.J.W. ex rel. Wilson*, 696 F.3d at 780. The district court explained that

56

the overbroad injunction sought by PDE would prevent enforcement of the entire Policy, which would "block students from any protection from harassment and bullying on the basis of gender identity," meaning that "a vulnerable child [would have] no remedy within the school district," and put the School District "between a rock and a hard place," as it "would be compelled to not interfere with bullying and harassment as relates to the Code provisions it is legally bound to enforce" and thus "face penalties for not effectuating [those] laws." App. 528; R. Doc. 38 at 14.

By contrast, the harm alleged by PDE is speculative at best, and is "not so great as to outweigh the harm to defendants and students within the [school] district." App. 529; R. Doc. 38 at 15. "[A]n illusory harm to the movant will not outweigh any actual harm to the non-movant." App. 527; R. Doc. 38 at 13 (quoting *Frank N. Magid Assocs, Inc. v. Marrs*, No. 16-CV-198-LRR, 2017 WL 3091457, at *5 (N.D. Iowa Jan. 9, 2017)) (internal quotations and citation omitted).

### 3. The district court correctly found that the public interest weighs against injunctive relief.

The public interest weighs heavily in favor of fighting discrimination on the basis of gender identity. *See Portz v. St. Cloud State Univ.*, 196 F. Supp. 3d 963, 978 (D. Minn. 2016) (finding that the public interest weighed in favor of the plaintiff who brought a Title IX claim "because the public's interest in eradicating sex discrimination is compelling"). PDE brings this action on behalf of seven alleged member-parents. The public interest in eradicating discrimination and harassment

57

toward all students based on gender identity, however, is much broader than the personal interests of individual parents wanting to access information regarding their students—especially when the Policy already acknowledges their right to inspect and review their child's education records upon request. As the district court noted, "[c]reating a safe environment for children necessarily includes ensuring no child is subject to harassment, bullying, or made to feel lesser for any reason by students, staff, or others while at school." App. 541; R. Doc. 38 at 27. Because PDE's alleged harms are speculative rather than imminent, the district court correctly found that "the public interest tips in favor of denying the injunction." *Id.*

## CONCLUSION

For the reasons stated above, the School District respectfully asks this Court to affirm the ruling of the district court denying PDE's motion for preliminary injunction.

/s/ *Miriam D. Van Heukelem*

Miriam D. Van Heukelem (AT0010074)

/s/ *Emily A. Kolbe*

Emily A. Kolbe (AT0012313)
AHLERS & COONEY, P.C.
100 Court Avenue, Suite 600
Des Moines, Iowa 50309
(515) 243-7611
(515) 243-2149 (fax)
mvanheukelem@ahlerslaw.com
ekolbe@ahlerslaw.com
ATTORNEYS FOR DEFENDANTS-APPELLEES

58

**CERTIFICATE OF SERVICE**

I certify that on December 8, 2022, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/ Emily A. Kolbe*

Appellate Case: 22-2927    Page: 59    Date Filed: 12/08/2022 Entry ID: 5225286

# CERTIFICATE OF COMPLIANCE

*Certificate of Compliance with Type-Volume Limitation,
Typeface Requirements, and Type Style Requirements*

1.    The brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because: this brief contains 12,956 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(b)(7)(B)(iii).

2.    The brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word in Times New Roman, 14 point font.

3.    This brief has been scanned for viruses and is virus-free in compliance with Local Rule 28A(h).

*/s/ Emily A. Kolbe*

02134460-1\17071-1601

60