# In the United States Court of Appeals for the Eighth Circuit

PARENTS DEFENDING EDUCATION,
*Plaintiff-Appellant*,

v.

LINN MAR COMMUNITY SCHOOL DISTRICT; SHANNON BISGARD, in his official capacity as Superintendent; BRITTANIA MOREY, In their official capacity as a member of the Linn Marr Community School District School Board; CLARK WEAVER, In their official capacity as a member of the Linn Marr Community School District School Board; BARRY L. BUCHHOLZ, In their official capacity as a member of the Linn Marr Community School District School Board; SONDRA NELSON, In their official capacity as a member of the Linn Marr Community School District School Board; MATT ROLLINGER, In their official capacity as a member of the Linn Marr Community School District School Board; MELISSA WALKER, In their official capacity as a member of the Linn Marr Community School District School Board; RACHEL WALL, In their official capacity as a member of the Linn Marr Community School District School Board,
*Defendants-Appellees.*

**On Appeal from the United States District Court for the
Northern District of Iowa, No. 1:22-cv-00078**

## REPLY BRIEF OF APPELLANT

ALAN R. OSTERGREN
ALAN OSTERGREN P.C.
500 Locust St., Suite 199
Des Moines, IA 50309
(515) 207-0314
alan.ostergren@ostergrenlaw.com

J. MICHAEL CONNOLLY
BRYAN WEIR
JAMES HASSON
THOMAS S. VASELIOU
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard, Suite 700
Arlington, VA 22209
(703) 243-9423
mike@consovoymccarthy.com
bryan@consovoymccarthy.com
james@consovoymccarthy.com
tvaseliou@consovoymccarthy.com

*Counsel for Plaintiff-Appellant*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..................................................................................ii

INTRODUCTION..............................................................................................1

ARGUMENT ....................................................................................................2

I.    PDE likely has standing ........................................................................2

    A.    PDE's members have shown an injury in fact...........................2

    B.    PDE has shown traceability and redressability.........................8

II.    PDE is likely to succeed on the merits..................................................11

    A.    The Policy likely violates the parents' fundamental rights ......................11

    B.    The Policy likely violates the First and Fourteenth Amendments ..........17

III.    PDE satisfies the remaining preliminary-injunction factors...............................22

CONCLUSION ...............................................................................................23

CERTIFICATE OF COMPLIANCE ...........................................................25

CERTIFICATE OF SERVICE .....................................................................26

Appellate Case: 22-2927     Page: 2     Date Filed: 12/30/2022 Entry ID: 5231399

# TABLE OF AUTHORITIES

**CASES**

*281 Care Comm. v. Arneson*,
  638 F.3d 621 (8th Cir. 2011)..................................................... 8

*Calgaro v. St. Louis Cnty.*,
  919 F.3d 1054 (8th Cir. 2019)................................................... 14

*Child Evangelism Fellowship of Minnesota v. Minneapolis Special Sch. Dist. No. 1*,
  690 F.3d 996 (8th Cir. 2012)..................................................... 23

*Davis v. Monroe Cnty. Bd. of Educ.*,
  526 U.S. 629 (1992)............................................................. 8, 20

*Deanda v. Becerra*,
  2022 WL 17572093 (N.D. Tex. Dec. 8, 2022) ................................ 16

*Dep't of Com. v. New York*,
  139 S. Ct. 2551 (2019) ............................................................. 6

*Digit. Recognition Network, Inc. v. Hutchinson*,
  803 F.3d 952 (8th Cir. 2015)...................................................... 9

*D.M. by Bao Xiong v. Minnesota State High Sch. League*,
  917 F.3d 994 (8th Cir. 2019)..................................................... 23

*Doe v. Heck*,
  327 F.3d 492 (7th Cir. 2003)...................................................... 17

*Doe v. Trump Corp.*,
  6 F.4th 400 (2d Cir. 2021) ........................................................ 16

*Eggers v. Evnen*,
  48 F.4th 561 (8th Cir. 2022)...................................................... 23

*FEC v. Cruz*,
  142 S. Ct. 1638 (2022) .......................................................... 6, 8

Appellate Case: 22-2927    Page: 3    Date Filed: 12/30/2022 Entry ID: 5231399

*Gruenke v. Seip,*
    225 F.3d 290 (3d Cir. 2000) ........................................................................ 15

*Hewitt v. Helms,*
    482 U.S. 755 (1987) ...................................................................................... 9

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.,*
    515 U.S. 557 (1995) ...................................................................................... 17

*Iancu v. Brunetti,*
    139 S. Ct. 2294 (2019) .................................................................................. 21

*Koehler v. Brody,*
    483 F.3d 590 (8th Cir. 2007) ........................................................................ 16

*Mahanoy Area Sch. Dist. v. B. L. by & through Levy,*
    141 S. Ct. 2038 (2021) ............................................................................ 15, 19

*Meriwether v. Hartop,*
    992 F.3d 492 (6th Cir. 2021) .................................................................... 18, 19

*Moore v. City of E. Cleveland,*
    431 U.S. 494 (1977) ...................................................................................... 16

*Parada v. Anoka Cnty.,*
    54 F.4th 1016 (8th Cir. 2022) ........................................................................ 9

*Parham v. J.R.,*
    442 U.S. 584 (1979) ................................................................................. 16, 17

*Religious Sisters of Mercy v. Becerra,*
    --- F.4th ---, 2022 WL 17544669 (8th Cir. Dec. 9, 2022) .................................. 4, 6, 7

*Ricard v. USD 475 Geary Cnty.,*
    2022 WL 1471372 (D. Kan. May 9, 2022) ...................................................... 15

*Rodgers v. Bryant,*
    942 F.3d 451 (8th Cir. 2019) ........................................................................ 20

*Saxe v. State Coll. Area Sch. Dist.,*
    240 F.3d 200 (3d Cir. 2001) ..................................................................... 19, 20

Appellate Case: 22-2927    Page: 4    Date Filed: 12/30/2022 Entry ID: 5231399

*Schmidt v. Des Moines Pub. Schools,*
   655 F.3d 811 (8th Cir. 2011) ........................................................................ 14

*Speech First, Inc. v. Fenves,*
   979 F.3d 319 (5th Cir. 2020) ......................................................................... 7

*Stevenson v. Blytheville Sch. Dist. #5,*
   800 F.3d 955 (8th Cir. 2015) ........................................................................ 14

*Susan B. Anthony List v. Driehaus,*
   573 U.S. 149 (2014) ............................................................................4, 6, 7, 8

*Tatel v. Mt. Lebanon Sch. Dist.,*
   2022 WL 15523185 (W.D. Pa. Oct. 27, 2022) ............................................. 15

*Texas v. United States,*
   809 F.3d 134 (5th Cir. 2015) ..................................................................22, 23

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.,*
   393 U.S. 503 (1969) ................................................................................19, 20

*Troxel v. Granville,*
   530 U.S. 57 (2000) ..............................................................................1, 11, 16

*United States v. All Assets Held at Credit Suisse (Guernsey) Ltd.,*
   45 F.4th 426 (D.C. Cir. 2022) ...................................................................... 16

*United States v. Stevens,*
   559 U.S. 460 (2010) ...................................................................................... 21

*Wooley v. Maynard,*
   430 U.S. 705 (1977) ...................................................................................... 17

## RULES

LR 505.6 ................................................................................................................. 12

iv

# OTHER AUTHORITIES

*Confronting Anti-LGBTQI+ Harassment in Schools: A Resource for Students and Families*, U.S. Dep't of Justice & U.S. Dep't of Educ., (June 2021), https://perma.cc/KA47-U9LJ ............................................................................ 10

Scalia & Garner, *Reading Law* (2012) ..................................................................... 3

*Sexual Orientation & Gender Identity: A Public Accommodations Provider's Guide to Iowa Law*, https://perma.cc/4LUP-LB98 ........................................................... 10

*Supporting Transgender Youth in School*, U.S. Dep't of Edu., https://perma.cc/2Q96-VY34 ................................................................................. 10

Appellate Case: 22-2927    Page: 6    Date Filed: 12/30/2022 Entry ID: 5231399

# INTRODUCTION

Though it tries, the District cannot avoid the plain text of its own regulations. The Policy prohibits school officials from telling parents the truth about the actions the school is taking, and it authorizes school officials to make fundamental decisions about the child—including changing the child's name, pronouns, and more—without ever notifying the child's parents or receiving the parent's consent. It is impossible for parents to protect their liberty interests in the "care, custody, and control of their children," *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (plurality), if the government withholds this basic and critical information from them. The District's defenses of its speech restrictions are even weaker. The Policy compels students to use pronouns despite their fundamental beliefs, punishes speech expressing the viewpoint that biological sex is immutable, and enacts a speech code that is hopelessly overbroad and vague.

In its response, the District does little more than repeat the district court's opinion. But that opinion was riddled with legal errors and is indefensible. In a last-ditch effort, the District twists the Policy's plain meaning and promises that it will not enforce the Policy according to its terms. Those efforts must fail. Because PDE is likely to prevail on the merits of its claims and the remaining preliminary-injunction factors can be resolved only in PDE's favor, this Court should enter an injunction itself or remand with instructions for the district court to do so.

1

# ARGUMENT

## I.    PDE likely has standing.

### A.    PDE's members have shown an injury in fact.

*Parental Rights.* As explained, PDE has shown at least two distinct injuries-in-fact caused by the Policy's parental-exclusion restrictions. *See* PDE-Br. 20-23. *First*, PDE's members want to regularly ask the District whether their children have been given a Gender Support Plan or the school has taken any other actions to effectuate their child's gender transition. But the Policy prohibits the District from providing this information without their child's permission. PDE-Br. 20. The District's only response is to assert that the Policy does not, in fact, "prohibit the School District from communicating with parents about their child's gender identity." Dist.-Br. 23-24, 51-52.

The District's reading finds no support in the Policy's text, which is unequivocal: "The district shall not disclose information that may reveal a student's transgender status to others including but not limited to other students, parents, and school staff unless legally required to do so (such as national standardized testing, drivers permits, transcripts, etc.) or unless the student has authorized such disclosure." App.297, R. Doc. 3-11, at 45. The District clings to the phrase "other students, parents, and school staff" and claims the Policy prohibits only "disclosing information about a student's transgender status to *other* students, parents, and school staff." Dist.-Br. 52. To begin, which words "other" is modifying matters little because the Policy prohibits "disclos[ing] information that may reveal a student's transgender status *to others*"—full

2

stop. App.297, R. Doc. 3-11, at 45 (emphasis added). The Policy then provides a non-exhaustive list of individuals who cannot receive such information, which "include[s]" but is "not limited to" "other students, parents, and school staff." *Id.*; Scalia & Garner, *Reading Law* 132-33 (2012) (the phrase "including but not limited to" is a "belts-and-suspenders phrase[]" that makes clear that "'the list is merely exemplary and not exhaustive'"). In any event, the most natural reading of the word "other" is that it modifies only the word "students," not parents and school staff. Indeed, it makes no sense to refer to "other parents" or "other school staff" when there is no initial group of parents or staffers to distinguish from. *See* App.297, R. Doc. 3-11, at 45.

This plain reading reflects the Policy's other commands that school officials hide information from a child's parents. *See* PDE-Br. 6-9. The Policy instructs school staff to "always check with the student first before contacting their parent/guardian" and to "ask the student what name and pronouns they would like school officials to use in communications with their family." App.297, R. Doc. 3-11, at 45. The District claims that "'check with the student' and 'ask the student' are not synonymous with 'lie to their parents.'" Dist.-Br. 52. But this explanation is nonsensical. By requiring officials to "check with" or "ask" a student which name and pronouns to use in communications with their parents, the Policy makes clear that school officials must follow the student's instructions and withhold the information from their parents. *See* App.297, R. Doc. 3-11, at 45; App.583, R. Doc. 25, at Tr. 39:3-7 (acknowledging that the Policy requires school officials to "consult with the student first" and "not simply assume that the

3

student has come out to their parents before calling and referring to them by chosen name and pronouns").

The District claims that its interpretation is supported by "the testimony of the district's superintendent" about the Policy's "implementation." Dist.-Br. 24. But if anything, the declaration *supports* PDE's reading. Superintendent Bisgard declared only that "[s]chool staff are expected to use reasonable professional judgment in communicating with parents/guardians," there is "no requirement that school staff report every aspect of a student's experiences at school to parents," and parents "have access to their student's education records upon request" as long as it is "consistent with [FERPA] and Board Policy 504.13-4." App.483, R. Doc. 15-5, at 2, ¶8; *see also* App.579-80, R. Doc. 25, at Tr. 35-36 (conceding that a child could have "their name … changed in their school records" without parent consultation). Regardless, the District cannot avoid a challenge to its policies merely by promising not to enforce them under their plain terms. *See* PDE-Br. 40. And again, to show standing, PDE need only prove that its members' intended conduct "is '*arguably* proscribed' by [the Policy]." *Religious Sisters of Mercy v. Becerra*, --- F.4th ---, 2022 WL 17544669, at *15 (8th Cir. Dec. 9, 2022) (emphasis added) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)). PDE easily clears that hurdle.

*Second*, there is a substantial risk that Parents A-C's children will receive a Gender Support Plan or other gender-specific treatment from District officials without the parents' knowledge. PDE-Br. 22. PDE's members want to exercise their fundamental

right as a parent to guide their child's upbringing and to help their children navigate any issues that might arise regarding their perception of their gender identity, but the Policy prohibits PDE's members from being part of these decisions without their children's "permission." PDE-Br. 21-22.

The District claims that the parents' fears are speculative because PDE identified no "specific outside observer" who "believes their child is confused about their gender" or has a "different gender identity." Dist.-Br. 21-23. But no such third-party evidence was needed; the parent testimony and scientific studies clear the low hurdle for standing at the preliminary-injunction stage. For example, Parent A's "child is on the autism spectrum and has a sensory processing disability." App.40, R. Doc. 3-2, at 2, ¶5. Parent A has devoted "significant resources to therapy services to help [their] child understand sex-specific differences." *Id.* Still, Parent A's child "sometimes makes statements that could lead an outside observer to believe that [their] child is confused about their gender identity or expressing a 'gender-fluid' or 'non-binary' identity." *Id.* Based on Parent A's understanding of their own child, Parent A believes their child will continue expressing these views to others, including school officials. *Id.* And scientific studies reinforce Parent A's belief that children with special needs are more susceptible to gender-identity confusion. *See* App.273-76, 285, 402, 449-54, R. Doc. 3-11, at 21-24, 33, 150, 197-202; App.215, R. Doc. 3-10, at 143. In fact, Parent A "requested confirmation that the school district will not assign [their] child a Gender Support Plan or take any other gender identity-related actions without informing [Parent A] and obtaining [Parent A's]

consent." App.42, R. Doc. 3-2, at 4, ¶12. The District refused to provide those assurances—which "is actually a concession that it" will take these actions. *Religious Sisters*, 2022 WL 17544669, at *15 (cleaned up). It is thus not "mere speculation" that Parent A's child would express gender-identity confusion to Linn-Mar officials; it's a "predictable" outcome. *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2566 (2019). So too for Parents B and C, who face materially similar situations and have children enrolled in Linn-Mar High School. *See* PDE-Br. 22.

The District's remaining arguments merely repeat the district court's flawed analysis and were already addressed in PDE's opening brief. PDE's injuries do not depend on multiple "layers of conjecture," Dist.-Br. 23, because there is a substantial risk that the injuries will occur, PDE-Br. 22. That the Policy forced Parent A to withdraw their child from the District does not deprive Parent A of standing because "an injury resulting from the application or threatened application of an unlawful enactment remains fairly traceable to such application, even if the injury could be described in some sense as willingly incurred," *FEC v. Cruz*, 142 S. Ct. 1638, 1647 (2022), and Parent A has declared that they will enroll their child in the middle school the coming year if the Policy is rescinded or enjoined, App.42, R. Doc. 3-2, at 4, ¶¶12-13; *see* PDE-Br. 23. And because PDE brings a *pre-enforcement* challenge, PDE need not allege that the District has "taken any action" against the children of Parents A-C. Dist.-Br. 21-23; *see Susan B. Anthony*, 573 U.S. at 158 (requiring only a "substantial risk that the harm will occur" (internal quotation marks omitted)).

6

*First Amendment Rights.* PDE's standing to challenge the Policy's speech restrictions is even clearer. The children of PDE's members want to engage in speech that is "arguably affected with a constitutional interest," their speech is "arguably proscribed" by the Policy, and there is a "substantial" threat of the District enforcing the Policy. *Susan B. Anthony*, 573 U.S. at 161-64 (cleaned up); *see* PDE-Br. 24. The District argues that PDE lacks standing because "the speech PDE complains of being chilled is not proscribed by the Policy." PDE-Br. 26-27. That is wrong. The Policy broadly prohibits speech that doesn't "respect a student's gender identity," App.298, R. Doc. 3-11, at 46, which encompasses the students' speech, *see* PDE-Br. 33-37; *infra* 17-21. More important, for standing purposes, all that matters is that the Policy "'*arguably* proscribe[s]'" the speech of PDE's members children. *Susan B. Anthony*, 573 U.S. at 162 (emphasis added); *see Speech First, Inc. v. Fenves*, 979 F.3d 319, 332 n.10 (5th Cir. 2020) (Appellee "also contends that the relevant inquiry is whether the policy actually prohibits the speech in question—not whether some might mistakenly believe it does. This is wrong. Under *Susan B. Anthony List*, the question is simply whether speech is arguably proscribed by the challenged policies." (cleaned up)); *Religious Sisters*, 2022 WL 17544669, at *14 (citing *Fenves* approvingly for standing). PDE clears that low bar.

The District similarly contends that PDE has no injuries because the First Amendment doesn't cover "harassment or bullying on the basis of gender … within the school environment" and so the speech at issue "is not constitutionally protected." Dist.-Br. 27. But none of the students want to engage in "harassment" or "bullying."

*See* App.55, R. Doc. 3-5, at 2, ¶6; App.59, R. Doc. 3-6, at 2, ¶5; App.67, R. Doc. 3-8, at 2, ¶6; *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 652 (1992) (defining "harassment" as conduct that is "so severe, pervasive, and objectively offensive that it denies its victims the equal access to education that Title IX is designed to protect"). In any event, the District again ignores the relevant inquiry for standing purposes. The question is whether the speech at issue is "*arguably* affected with a constitutional interest." *Susan B. Anthony*, 573 U.S. at 161 (emphasis added) (cleaned up); *see Cruz*, 142 S. Ct. at 1647 ("For standing purposes, we accept as valid the merits of appellees' legal claims."). It plainly is. *See* PDE-Br. 23; *infra* 17-22.

Like the district court, the District argues that PDE lacks standing because it "failed to show that any student's speech 'resulted in discipline under the Policy [or] that they have been threatened with discipline directly if they do express their views on gender identity.'" Dist.-Br. 28. But students need not be punished or threatened with punishment to bring a pre-enforcement challenge to a policy. *See, e.g.*, *281 Care Comm. v. Arneson*, 638 F.3d 621, 627 (8th Cir. 2011); PDE-Br. 24-25.

### B. PDE has shown traceability and redressability.

PDE readily satisfies the remaining standing requirements. The Policy causes PDE's members' injuries, as explained above, and these injuries are likely redressable by the relief requested (a declaration that the District's actions are unconstitutional and an injunction prohibiting the District from enforcing the Policy). The District argues that PDE's injuries are not redressable because if PDE "succeed[s] in securing

Appellate Case: 22-2927     Page: 14     Date Filed: 12/30/2022 Entry ID: 5231399

injunctive relief and prevent[s] the Policy from going into effect," the District "still has a duty under the law and other applicable School District policies to ensure students are not subjected to any unlawful discrimination." Dist.-Br. 30. This argument fails for multiple reasons.

To start, the District ignores that PDE also has sought a declaratory judgment that the District's actions are unconstitutional. App.36, R. Doc. 1, at 28. A declaratory judgment is appropriate when it "settles 'some dispute which affects the behavior of the defendant towards the plaintiff.'" *Parada v. Anoka Cnty.*, 54 F.4th 1016, 1023 (8th Cir. 2022) (quoting *Hewitt v. Helms*, 482 U.S. 755, 761 (1987)). Because PDE sued "the defendant officials [that] enforce the [Policy]," a declaratory judgment that their actions are unconstitutional would "meet the requirement of redressability." *Digit. Recognition Network, Inc. v. Hutchinson*, 803 F.3d 952, 959 (8th Cir. 2015).

PDE's requested injunction would also redress its injuries. *See* PDE-Br. 26-27. PDE challenged a policy that explicitly requires the government to take unconstitutional actions and PDE seeks an injunction prohibiting the government and its officials from enforcing the policy. PDE had no obligation to challenge every conceivable state and federal law and school-board policy that the District could point to in the future to justify taking the same actions. *See* PDE-Br. 26.

In all events, as explained, no state or federal law requires school districts to take the actions challenged here—*e.g.*, to prohibit parents from knowing about or being involved with their child's gender transition and to punish students for any speech that

9

doesn't "respect a student's gender identity." *See* PDE-Br. 26. Nor do any of the District's additional authorities and guidance documents (at 31-32) come anywhere close to requiring such actions. *See, e.g.*, *Supporting Transgender Youth in School*, U.S. Dep't of Edu., https://perma.cc/2Q96-VY34 (discussing various policies that schools "can consider developing in partnership with students, families, and advocates to support transgender students," including, as a general matter, "policies that respect all students' gender identities"); *Confronting Anti-LGBTQI+ Harassment in Schools: A Resource for Students and Families*, U.S. Dep't of Justice & U.S. Dep't of Educ., (June 2021), https://perma.cc/KA47-U9LJ (stating that the Civil Rights Division and Office for Civil Rights would investigate an incident in which "a transgender boy introduces himself as Brayden … and every day during physical education class [classmates] call him transphobic slurs, push him, and call him by his former name"); *Sexual Orientation & Gender Identity: A Public Accommodations Provider's Guide to Iowa Law*, https://perma.cc/4LUP-LB98 (providing a two-page pamphlet "for general educational purposes only" stating that "intentional[ly] us[ing] names and pronouns inconsistent with a person's presented gender" "*could*" amount to "illegal harassment" (emphasis added)). And Policy 504.13 simply states that "[w]hen an issue or concern arises that is not adequately addressed by [Policy 504.13-R], district administration will consider and assess the needs and concerns of each student on an individual bases [*sic*] in consultation with parents, when appropriate." App.476, R. Doc. 15-3, at 1. The District fails to explain why the existence of this policy—which provides a general

10

disclaimer of how the District will handle situations not covered by the Policy—prevents the Court from redressing PDE's injuries.

## II. PDE is likely to succeed on the merits.

### A. The Policy likely violates parents' fundamental rights.

The District tilts at windmills. According to the District, PDE believes that it is "entitled to unlimited information," that its members must receive "notice of any conversation, discussion, or statements involving their child that might implicate their child's gender identity," and that school employees must "preemptively report to parents" any information that would reveal their child's transgender status. PDE-Br. 47, 53. None of that is true. PDE claims two distinct constitutional injuries, neither of which the District can refute.

*First*, PDE's members want to regularly ask the District whether their children have been given a Gender Support Plan or the school has taken any other actions to effectuate their child's gender transition, but the Policy prohibits the District from providing this information. PDE-Br. 20. The District barely contends that such a policy would be constitutional. That is because it is impossible for parents to direct the "care, custody, and control of their children" when the government deliberately withholds such critical information from them. *Troxel*, 530 U.S. at 65; *see* PDE-Br. 29. The District's primary argument is to assert that the Policy does not, in fact, "prohibit the School District from communicating with parents about their child's gender identity." Dist.-Br. 51-52. As explained above, that interpretation has no textual basis in the

Policy. *Supra* 2-4; PDE-Br. 6-9.

The District argues that parents may be able to learn about the actions the school is taking through other means because the Policy "explicitly references and upholds a parent's right to access education records under the Family Education Rights & Privacy Act ('FERPA')." Dist.-Br. 51. But the Policy says nothing of the sort. The Policy says only that (1) school officials should not disclose a student's transgender status because such information may be "personally identifiable information" under FERPA; and (2) parents generally have the "right to review their student's education records under FERPA." App.297-98, R. Doc. 3-11, at 45-46. Indeed, far from guaranteeing a parent's right to access these records, the Policy makes clear that schools will *withhold* these records under a "counselor/student" privilege. The Policy requires "[a]ll written records related to student meetings concerning their gender identity and/or gender transition" to be kept in a "temporary file" that shall be "maintained by the school counselor" and "only be accessible to staff members that the student has authorized in advance to do so." App.300, R. Doc. 3-11, at 48. The Policy adds that the "[c]onversations between students and school counselors are protected, confidential conversations under applicable counselor/student laws." App.297, R. Doc. 3-11, at 45. And the District elsewhere instructs that parents "may be denied access to a student's education records ... when the district has been advised under the appropriate laws that the parents [may] not access the student's education records." LR 505.6, *Education Records Access*, https://perma.cc/T5SD-U35L.

Even if a parent could somehow gain access to these records, that still would not ensure that the parent learns about the school's actions concerning their child's gender identity. The Policy makes clear that formal documentation "is not required for a student to receive [gender-identity-related] supports at school." App.297, R. Doc. 3-11, at 45. When no written Gender Support Plan exists, "school administrators and/or school counselors shall work with the student to identify and coordinate support." *Id.* Simply put, the possibility that parents *might* gain access to student records and these records *might* contain information about some of the school's actions cannot be sufficient to save the Policy.

*Second*, PDE's members want to exercise their fundamental right as a parent to guide their child's upbringing and to help their children navigate any issues that might arise regarding their perception of their gender identity. But the Policy prohibits PDE's members from being part of these decisions without their child's "permission." PDE-Br. 21-22. On this claim, the District doesn't deny the key facts. The Policy authorizes school officials to make crucial decisions regarding a child's gender identity (*e.g.*, through a Gender Support Plan) without ever informing the child's parents. And the child's parents can be excluded entirely from the decisionmaking process, even if the parents learn of the school's actions. *See* PDE-Br. 6-9; App.296-97, R. Doc. 3-11, at 44-45 (students decide "who is a part of the meeting [to create a Gender Support Plan], including whether their parent/guardian will participate"); Dist.-Br. 50 (the Policy "gives priority to the preferences of older students in grades 7-12 over their parents in

13

the supports included in a gender support plan" to "further[] [the District's] objective that all students be provided a safe, affirming, and health[y] school environment" (cleaned up)).

Instead, the District claims that its actions implicate no constitutional rights *at all*. Dist.-Br. 47-48. Relying on *Stevenson v. Blytheville Sch. Dist. #5*, 800 F.3d 955, 967 (8th Cir. 2015), the District claims that "[w]here a school district 'has not restricted the [appellants'] constitutional right to educational choice' and parents have 'freely chosen' to enroll children in a public school district, a parent's liberty interest has been satisfied." Dist.-Br. 48. But *Stevenson* says no such thing. There, this Court considered only whether a parent's "constitutional right to educational choice" included the right to "to choose where his or her child is educated within the public school system." *Stevenson*, 800 F.3d at 967 (cleaned up). Nothing in *Stevenson* suggests parents forfeit their rights to be consulted about potentially life-altering decisions regarding their children's gender identities simply by enrolling them in public school.

Again, PDE's assertion of constitutional rights is not as expansive as the District asserts. PDE does not claim that parents have the right to all "information" about their children no matter how "minor and sporadic." *Schmidt v. Des Moines Pub. Schools*, 655 F.3d 811, 819 (8th Cir. 2011). And PDE does not argue that parents have the right to "manage all details of their children's education or to obtain consultation with school officials on everyday matters." *Calgaro v. St. Louis Cnty.*, 919 F.3d 1054, 1059 (8th Cir. 2019). But the Policy is no "minor" or "everyday" matter, and the District's attempt to

14

trivialize it as such is remarkable. The Policy authorizes the District to effectuate a child's gender transition through a Gender Support Plan without *any* involvement or consultation from the child's parents. The Policy thus takes issues "fundamental to a child's identity, personhood, and mental and emotional well-being," *Ricard v. USD 475 Geary Cnty.*, 2022 WL 1471372, at *8 (D. Kan. May 9, 2022), and places them solely in the hands of the government. Indeed, "'social transition' is 'an active intervention because it may have significant effects on the child or young person in terms of their psychological functioning.'" Br. of State of Montana, et al. at 11 (alteration omitted) (quoting medical literature). "The District presumably does not treat a child's depression or other mental health issues without involving parents, and it has no duty or right to keep parents in the dark about gender-related distress, either." *Id.*

The District's view of parental rights also conflicts with centuries of American jurisprudence. *See, e.g.*, *Mahanoy Area Sch. Dist. v. B. L. by & through Levy*, 141 S. Ct. 2038, 2053 (2021) (Alito, J., concurring) ("In our society, parents, not the State, have the primary authority and duty to raise, educate, and form the character of their children. Parents do not implicitly relinquish all [their] authority when they send their children to a public school." (citations omitted)); *Gruenke v. Seip*, 225 F.3d 290, 307 (3d Cir. 2000) ("Public schools must not forget that '*in loco parentis*' does not mean 'displace parents.'"); *Tatel v. Mt. Lebanon Sch. Dist.*, 2022 WL 15523185, at *23 (W.D. Pa. Oct. 27, 2022) ("Parents have a fundamental constitutional right to control the inculcation of values in their children," and "[t]he transgender topics at issue implicate a core parental interest

15

in forming the identity of their children."); *see also Deanda v. Becerra*, 2022 WL 17572093, at *11-17 (N.D. Tex. Dec. 8, 2022). True, *Troxel* and other parental-rights cases "did not expressly consider" the facts presented here. *Moore v. City of E. Cleveland*, 431 U.S. 494, 500 (1977). "But unless [the Court] close[s] [its] eyes to the basic reasons why certain rights associated with the family have been accorded shelter under the Fourteenth Amendment's Due Process Clause," it "cannot avoid applying the force and rationale of these precedents" to the facts here. *Id.* at 501.

Last, the District claims—without any citation—that it argued below that the Policy would survive strict scrutiny. Dist.-Br. 50 n.5. But it never did. *See generally* Dkt.15-1. That the District mentioned a different case in which another district court examined a different policy is plainly insufficient. *See Doe v. Trump Corp.*, 6 F.4th 400, 411 (2d Cir. 2021) ("This casual citation to *Contec*, without further explanation or argument, neither made nor preserved any such argument."). And even now, the District's argument is limited to two sentences in a footnote. The argument is forfeited for that reason too. *See Koehler v. Brody*, 483 F.3d 590, 599 (8th Cir. 2007) (argument made in "a conclusory manner" in "one-sentence footnote" was forfeited); *United States v. All Assets Held at Credit Suisse (Guernsey) Ltd.*, 45 F.4th 426, 434 (D.C. Cir. 2022) ("'cursory arguments made only in a footnote' are forfeited").

The District's argument fails anyway. PDE-Br. 31-32. School Districts "have no interest—much less a compelling one—in hiding minor students' gender transitions from their parents." Br. of State of Montana, et al. 1-2, 8; *see also Parham v. J.R.*, 442 U.S.

584, 602 (1979) ("The law's concept of the family rests on a presumption that parents possess what a child lacks in maturity, experience, and capacity for judgment.… [H]istorically, it has recognized that natural bonds of affection lead parents to act in the best interests of their children."). And even if there were certain circumstances in which disclosure could harm the "physical and psychological well-being" of the child, Dist.-Br. 50 n.5, the Policy is not remotely tailored to address these circumstances, PDE-Br. 31-32; *see Doe v. Heck*, 327 F.3d 492, 521 (7th Cir. 2003) (government "not only failed to presume" that parents will "act in the best interest of their children, [it] assumed the exact opposite").

### B. The Policy likely violates the First and Fourteenth Amendments.

The District defends the Policy's speech restrictions by simply repeating verbatim the district court's flawed analysis, failing to meaningfully address any of PDE's arguments. The District's efforts fall short. The Policy unconstitutionally compels speech, is viewpoint- and content-based, and is overbroad and vague.

*Compelled Speech.* The District argues that the Policy does not compel speech because it "does not require students to speak to other students" or to "refer to other students by names or pronouns." Dist.-Br. 34. But as explained, the compelled-speech doctrine isn't limited to laws and policies that literally require a person to speak upon threat of punishment. *See* PDE-Br. 33-34 (citing *Wooley v. Maynard*, 430 U.S. 705 (1977), and *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557 (1995)). The District has no response to this line of cases.

Appellate Case: 22-2927   Page: 23   Date Filed: 12/30/2022 Entry ID: 5231399

Echoing the district court, the District argues that the Policy does not compel speech because students can use the word "they" to refer to a person. Dist.-Br. 34. But compelling a student to use this word is still compelled speech. PDE-Br. 34-35. And in any event, using the word "they" instead of the student's preferred pronouns still violates the Policy. PDE-Br. 34-35. Here too the District has no response.

The District's primary argument is that it can compel students to use certain pronouns because schools can "require students to address each other in a civil manner" and using a student's prefer pronouns "is not a 'belief' [but] a matter of basic civility." Dist.-Br. 35, 38. This argument fails. To start, the decision on which pronoun to use is unquestionably a "belief" that deserves First Amendment protection. "Pronouns can and do convey a powerful message implicating a sensitive topic of public concern." *Meriwether v. Hartop*, 992 F.3d 492, 508 (6th Cir. 2021). When a student uses a pronoun matching the person's sex rather than the person's gender identity, the student's "mode of address [is] the message. It reflect[s] his conviction that one's sex cannot be changed." *Id.*; *see also* Br. of Moms for Liberty, et al. 10-14; Br. of Institute for Faith and Family 12-15. Those convictions often flow from deeply held religious beliefs and cultural teachings. *See* Br. of Jewish Coalition for Religious Liberty, et al. 11-17 (describing Jewish, Hindu, and Islamic teachings about sex and gender). "If a student believes [sex is immutable], he is (from his perspective) lying if he calls or addresses someone by a name or pronoun that is different from that assigned at birth or conception." Br. of Foundation for Moral Law 8. Indeed, the District wants to force

18

students to use certain pronouns precisely because these words *do* "communicate a message: People can have a gender identity inconsistent with their sex at birth." *Meriwether*, 992 F.3d at 507.

Nor does the District show that schools can compel speech under the guise of "civility." Dist.-Br. 35-38. The Supreme Court has outlined only "three specific categories of student speech that schools may regulate in certain circumstances: (1) indecent, lewd, or vulgar speech uttered during a school assembly on school grounds; (2) speech, uttered during a class trip, that promotes illegal drug use; and (3) speech that others may reasonably perceive as bearing the imprimatur of the school, such as that appearing in a school-sponsored newspaper." *Mahanoy*, 141 S. Ct. at 2045 (cleaned up). Compelling the use of certain pronouns fits none of these categories, and the District makes no argument to the contrary.

Instead, the District argues that it can compel the use of certain pronouns because "'schools have a special interest in regulating speech that'" involves an "'invasion of the rights of others.'" Dist.-Br. 39-42 (quoting *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 513 (1969)). Although "the precise scope of *Tinker*'s 'interference with the rights of others' language is unclear," it is "certainly not enough that the speech is merely offensive to some listener." *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 217 (3d Cir. 2001) (Alito, J.). And while the District can of course protect its students from "discrimination" and "harassment," *see* Dist.-Br. 43, none of the speech the students here want to express comes remotely close to satisfying those

19

standards. *Compare* App.55, R. Doc. 3-5, at 2, ¶6; App.59, R. Doc. 3-6, at 2, ¶5; App.67, R. Doc. 3-8, at 2, ¶6, *with Davis*, 526 U.S. at 652 (defining "harassment" as conduct that is "so severe, pervasive, and objectively offensive that it denies its victims the equal access to education that Title IX is designed to protect"). Because the Policy "prohibits substantially more conduct than would give rise to liability under" these laws, "any interest in avoiding liability" under these laws is "unavailing." *Saxe*, 240 F.3d at 217. Simply put, no interest in "civility" could possibly justify denying students "their constitutional rights to freedom of speech or expression." *Tinker*, 393 U.S. at 506; *see id.* at 509 (Schools may not suppress speech merely "to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint.").

*Content and Viewpoint Discrimination.* The District argues that the Policy "does not constitute content or viewpoint discrimination" because it "does not prohibit the expression of an idea but rather requires that, to the extent one student addresses another, they must do so in the manner preferred by that student." Dist.-Br. 38 (cleaned up). As an initial matter, the Policy prohibits far more speech than names and pronouns. PDE-Br. 9-10, 36-39; *supra* 6-7. But even if true, a policy requiring students to use certain pronouns is still a content-based and viewpoint-based regulation. PDE-Br. 36-38. The Policy is content-based because "its application depends on the 'communicative content' of the speech," *Rodgers v. Bryant*, 942 F.3d 451, 456 (8th Cir. 2019), namely, whether the student uses the "preferred" pronouns. And the Policy is viewpoint-based because it prohibits speech that "offend[s]" another by using the

20

"wrong" pronouns. *Iancu v. Brunetti*, 139 S. Ct. 2294, 2301 (2019). The District grapples with none of the arguments and authorities PDE cites, instead choosing to merely regurgitate the district court's flawed analysis. Dist.-Br. 38-39, 43-44. As previously explained, those arguments are insufficient. PDE-Br. 36-38.

Likely recognizing that the Policy prohibits speech based on content and viewpoint, the District mainly argues that the Policy is constitutional because schools have special leeway to punish disfavored speech. Dist.-Br. 39-43. That argument fails, as explained above. *Supra* 19-20.

*Overbreadth.* Parroting the district court, the District argues that the Policy is not overbroad because it is not "'intended'" to discipline "'accidental misuse, jokes, or opinions related to gender identity'" and there is "'nothing in the record'" showing that the District has punished students for speech other than the "'misuse of a name or pronoun.'" Dist.-Br. 45. The government's good intentions and enforcement history don't matter in an overbreadth challenge. PDE-Br. 40. And the Policy's requirement that students "respect a student's gender identity" sweeps in countless forms of protected speech. PDE-Br. 39-40. The District cannot avoid an overbreadth challenge by rewriting its Policy on appeal. *United States v. Stevens*, 559 U.S. 460, 481 (2010).

For the first time, the District argues that the Policy prohibits off-campus speech only when the student is "on school-owned or sanctioned activities" or "while away from school grounds if the conduct materially interferes with the orderly operation of the educational environment or is likely to do so." Dist.-Br. 46 (quoting App.485, R.

Doc. 15-6, at 1). Yet nothing in the Policy limits its scope to these circumstances. The Policy simply states that "[a]n intentional and/or persistent refusal by staff or students to respect a student's gender identity is a violation of school board policies" on bullying, harassment, and Title IX. App.298, R. Doc. 3-11, at 46.

*Vagueness.* As explained, the Policy is void for vagueness because it gives students no guidance about what speech is and is not permitted. PDE-Br. 41-43. The District's only response is to cut and paste a block quote from the district court's opinion. Dist.-Br. 46. PDE persuasively explained why the district court erred. *See* PDE-Br. 42-43. The District's complete failure to address PDE's arguments and authorities is telling. The Policy is unconstitutionally vague.

## III. PDE satisfies the remaining preliminary-injunction factors.

The remaining factors heavily favor PDE. *See* PDE-Br. 43-46.

*Irreparable Harm.* The District argues that PDE cannot show irreparable harm because "PDE has not shown that there have been disciplinary actions taken against any student, or that gender support plans have been given to the children of Parents A-C, or that Parents A-C have been denied information about their children." Dist.-Br. 56. But "[t]he injury need not have been inflicted when application for the injunction is made or be certain to occur." *Texas v. United States*, 809 F.3d 134, 173 n.137 (5th Cir. 2015) (cleaned up). Indeed, it is "a fundamental principle of preliminary injunctions" that "[a]n injunction is of no help if one must wait to suffer injury before the court

Appellate Case: 22-2927    Page: 28    Date Filed: 12/30/2022 Entry ID: 5231399

grants it." *Id.* The District's remaining arguments simply repeat their merits arguments, which fail for the reasons explained above.

 ***Balance of Equities and Public Interest.*** "The balance-of-harms and public-interest factors merge when the Government … is the nonmoving party." *Eggers v. Evnen*, 48 F.4th 561, 564-65 (8th Cir. 2022) (cleaned up); *see also* PDE-Br. 44-45 & n.4. Contra the District, an injunction would not prevent the District from protecting students against discrimination and harassment. PDE-Br. 45-46. And it's "always in the public interest to prevent the violation of a party's constitutional rights." *D.M. by Bao Xiong v. Minnesota State High Sch. League*, 917 F.3d 994, 1004 (8th Cir. 2019) (cleaned up); *see also, e.g.*, *Child Evangelism Fellowship of Minnesota v. Minneapolis Special Sch. Dist. No. 1*, 690 F.3d 996, 1004 (8th Cir. 2012) ("The likely First Amendment violation further means that the public interest and the balance of harms … favor granting the injunction."). These factors favor a preliminary injunction too.

## CONCLUSION

 This Court should reverse the district court and enter a preliminary injunction.

Dated:     December 29, 2022          Respectfully submitted,

*/s/ J. Michael Connolly*
J. Michael Connolly
Bryan Weir
James Hasson
Thomas S. Vaseliou
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Suite 700
Arlington, VA 22209
(703) 243-9423
mike@consovoymccarthy.com
bryan@consovoymccarthy.com
james@consovoymccarthy.com
tvaseliou@consovoymccarthy.com

Alan R. Ostergren
Alan Ostergren, P.C.
500 Locust St., Suite 199
Des Moines, IA 50309
(515) 207-0314
alan.ostergren@ostergrenlaw.com

*Counsel for Plaintiff-Appellant*

24

## CERTIFICATE OF COMPLIANCE

This brief complies with Rule 32(a)(7)(B) because it contains 6,030 words, excluding the parts exempted by Rule 32(f). This brief also complies with Rule 32(a)(5)-(6) because it is prepared in a proportionally spaced face using Microsoft Word 2016 in 14-point Garamond font.

The electronic version of the brief has been scanned for viruses and is virus-free.

Dated: December 29, 2022                    */s/ J. Michael Connolly*

Appellate Case: 22-2927    Page: 31    Date Filed: 12/30/2022 Entry ID: 5231399

## CERTIFICATE OF SERVICE

I certify that on December 29, 2022, I electronically filed the foregoing with the Clerk of Court using the CM/ECF System, which will automatically send email notification to all counsel of record.

*/s/ J. Michael Connolly*

Appellate Case: 22-2927     Page: 32     Date Filed: 12/30/2022 Entry ID: 5231399